Dissenting opinion filed by Circuit Judge WALLACH.
STOLL, Circuit Judge.
Garco Construction, Inc., appeals a decision of the Armed Services Board of Contract Appeals denying Garco’s damages claim arising out of its contract with the U.S. Army Corps of Engineers to build housing units on Malmstrom Air Force Base. Garco argues that a change in the base access policy prevented its subcontractor from bringing many of its workers onto the base, requiring its subcontractor to hire and train more workers, and forcing it to incur additional costs. Garco also alleges a constructive acceleration of the contract. Because we conclude that there was no change to the base access policy, we reject Garco’s arguments and affirm the Board’s decision.
Background
Malmstrom Air Force Base in Great Falls, Montana, is the largest missile complex in the Western Hemisphere. The base houses the Minuteman III intercontinental ballistic missiles, which carry a nuclear payload. The U.S. Army Corps of Engineers put out for bid Contract No. W912DW-06-C-0019 to build housing units on the base, and on August 3, 2006, awarded the contract to Garco Construction, Inc. Garco subcontracted some of the work to James Talcott Construction (“JTC”) in September 2006. JTC had performed considerable work on the base in the past.
The Corps of Engineers—Garco contract contained two provisions especially pertinent here: (1) it incorporated Federal Acquisition Regulation (“FAR”) § 52.222-3, which provides that contractors are permitted to employ ex-felons; and (2) it required contractors to at all times adhere to the base access policy. The base access policy, in place since at least 2005, indicated:
A 911 Dispatcher will run the employees!”] name[s] through the National Criminal Information Center [ (“NCIC”) ] system for a wants and warrants check. Unfavorable results will be scrutinized and eligibility will be determined on a case-by-case basis by the 341 SFG/CC.
J.A. 51 (emphasis added).
After work on the contract began, JTC began experiencing difficulty bringing its crew onto the base. JTC bussed many of its workers to the base from a local prison’s pre-release facility, and those workers in particular experienced difficulty accessing the base. Other JTC workers who were not from the pre-release facility but who had criminal records were also refused base entry. JTC’s President testified that JTC had not encountered similar access denials in its performance of other Malm-strom contracts over the nearly twenty years it had worked on the base.
Malmstrom’s Chief of Security Forces Plans and Programs at the time, Michael Ward, stated in a 2012 declaration that JTC had been “essentially by-pass[ing] security procedures” at the base. J.A. 279, ¶ 6. Mr. Ward explained that JTC had been gaining base access for its bussed-in, *941 pre-release facility workers by having a retired military member ride on the bus and vouch for everyone on it, which the base permitted at the time. Eventually, there was an incident on a Garco jobsite where a pre-release facility worker beat his manager with a wrench, and Mr. Ward later discovered that this worker had a violent criminal background.
In May 2007, JTC voiced concerns to Garco and the Air Force -regarding the difficulty it experienced getting its workers onto the base, although it acknowledged that violent criminals and sex offenders should not be granted base access. Informal communications from the Air Force indicated that violent criminals and sex offenders would continue to be denied base access. After numerous ex-changes between the parties, the Base Commander Major General Sandra Finan[1]—who was ultimately responsible for base access— issued a memorandum on October 22, 2007, indicating:
The 911 Dispatch Center will input all listed employees’ name[s] and data into the National Criminal Information Center (NCIC) database for a background check in accordance with Air Force directives. Unfavorable results from the background check will result in individuals being denied access to the installation, including, but not limited to, individuals that are determined to fall into one or more of the following categories: those having outstanding wants or warrants, sex offenders, violent offenders, those who are on probation, and those who are in a pre-release program. The definition of sex offender and violent offender can be found at Montana Code Annotated § 46-23-502.
J.A. 151 (emphases added).
Two days after Maj. Gen. Finan issued her base access memorandum, JTC submitted a request for equitable adjustment (“REA”) of the contract. JTC explained in the REA that its inability to use convict labor on the base greatly reduced the size of the experienced labor pool from which it could hire in the Great Falls, Montana, area. JTC claimed that, as a result, it incurred nearly half-a-million dollars ($454,266.44) of additional expenses from additional time interviewing and hiring new workers, paying overtime to new workers, and training new and less experienced workers. Notably, the REA only requested additional money; it did not request a time extension.
The Air Force denied the REA, and JTC, through Garco, requested reconsideration by the contracting officer. Eventually the claim reached the Armed Services Board of Contract Appeals. The Board first granted partial summary judgment, “holding that [Maj. Gen.] Finan’s 22 October 2007 base access memorandum was a sovereign act and the Air Force was not liable for damages from that date forward.” Appeals of—Garco Constr., Inc., ASBCA No. 57796, 15-1 B.C.A. (CCH) ¶ 36,135 (Sept. 22, 2015). In a later decision, the Board held that the base access policy in place at contract award in August 2006 was also a sovereign act, and moreover, was not changed by the October 2007 memorandum. The Board therefore rejected Garco’s argument that prior to October 22, 2007, the Air Force could only deny access to workers who had outstanding “wants or warrants.” Instead, the Board found that a “wants and warrants” check was synonymous with a background check and Maj. Gen. Finan’s memorandum was simply a clarification of—not a change to— the base access policy, and therefore the *942 Air Force was not liable for damages before the memorandum issued either. The Board also concluded that the Air Force’s increased enforcement of the base access policy did not constitute a constructive acceleration of the contract, and that JTC could not recover under that theory.
Garco appeals the Board’s decision, and we have jurisdiction under 28 U.S.C. § 1296(a)(10) and 41 U.S.C. § 7107(a)(1).
Discussion
On appeal, Garco raises two narrow issues, which we address in turn below: (1) that Maj. Gen. Finan’s October 2007 memorandum changed the base access policy and the policy it allegedly supplanted did not authorize the exclusion of workers with criminal records; and (2) that the Air Force’s sovereign act of denying base entry to JTC’s workers constituted a compensable constructive acceleration of the contract. Notably, Garco concedes that if we determine Maj. Gen. Finan’s October memorandum did not change the base access policy, then their arguments fail. See Oral Arg. at 4:28-4:48, http:// oralarguments.cafc.uscourts.gov/default. aspx?fl=2016-1936.mp3. Garco does not challenge the Board’s determination that the base access policy is a sovereign act.[2]
I.
Garco first asserts that the base access policy did not authorize the Air Force to prohibit workers with a criminal record from entering the base until Maj. Gen. Finan’s October 2007 memorandum issued, and therefore JTC’s request for equitable adjustment (or REA) should have been granted. As support, Garco turns to the language of the base access policy, particularly its reference to the NCIC “wants and warrants check” that the 911 dispatcher was to perform under the policy. Garco argues that this language is plain on its face and means that only a search for outstanding wants or warrants was to be performed. Garco argues that anything more, such as a search of a criminal record, falls outside the stated restrictions on access. Garco also directs us to a line from Maj. Gen. Finan’s testimony where she stated that denying access from those with a violent background or in pre-release programs was a “large change” to the base access policy.- Appellant Br. 37 (citing J.A. 299). As further support, Garco notes that Maj. Gen. Finan’s October 2007 memorandum refers to a “background check,” rather than a “wants and warrants check.”
Addressing Garco’s argument requires us to interpret the base access poli *943 cy, an agency regulation. This is a legal issue which, under the Contract Disputes Act, 41 U.S.C. §§ 7101-09, we review de novo. Gen. Dynamics Corp. v. Panetta, 714 F.3d 1375, 1378 (Fed. Cir. 2013). However, “[t]he agency’s construction of its own regulations is ‘of controlling weight unless it is plainly erroneous or inconsistent with the regulation.’ ” Reizenstein v. Shinseki, 583 F.3d 1331, 1335 (Fed. Cir. 2009) (quoting Cathedral Candle Co. v. U.S. Int’l Trade Comm’n, 400 F.3d 1352, 1364 (Fed. Cir. 2005)); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Garco does not challenge this proposition, but instead argues that no deference is due when the agency’s interpretation contradicts the plain and sensible meaning of the regulation. Roberto v. Dep’t of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).
We disagree with Garco that the plain text of the base access policy unambiguously resolves the dispute. As when we construe statutory language, we must consider the regulation as a whole and the term “wants and warrants check” in the context in which it was used. See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am., 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) (“[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.” (internal quotation marks omitted)); Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (“The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.”). While there may be some merit to Garco’s argument that the plain meaning of “wants and warrants check” in isolation suggests a check only for wants or warrants, the surrounding language casts doubt on that interpretation.
For example, the sentence immediately following the disputed “wants and warrants check” language reads: “Unfavorable results will be scrutinized and eligibility will be determined on a case-by-case basis.” J.A. 51. This directive for a case-by-case analysis of unfavorable results suggests that the check is more searching than a simple check for outstanding wants or warrants. Indeed, the government introduced testimony that anyone with a want or warrant would be immediately detained and would not be “scrutinized” with “eligibility ... determined on a case-by-case basis.” J.A. 25. Garco’s explanation that this sentence could mean that the Air Force may grant base access to those with old, but still outstanding, warrants is not convincing. At bottom, we find that this sentence cuts against Garco’s plain meaning interpretation such that we must consider the Air Force’s interpretation. Reiz-enstein, 583 F.3d at 1336-37. (considering agency interpretation of its own regulation when “the text of the regulation does not unambiguously answer the question” presented).
The Air Force interprets the base access policy as providing for a criminal background check. The Air-Force presented significant evidence to support this interpretation. JTC’s own statements and actions during the relevant timeframe support the Air Force’s interpretation. Meeting minutes from a project meeting held around the time JTC executed the subcontract with Garco indicate that worker “names will be sent to dispatch for background checks.... No one with outstanding warrants, felony convictions, or on probation will be allowed on base.” J.A. 270- *944 71. The minutes directed the recipients to “review these minutes and respond within ten days in writing should any discrepancies or omissions be noted.” J.A. 270. Neither JTC nor Garco contacted the Air Force about how the minutes characterized the base access policy. Further, when JTC first experienced base access issues with its workers, it specifically requested that certain workers be granted base access but “recognize[d] that this would not apply to sexual offenders or violent offenders.” J.A. 281.
In addition to JTC’s own statements and actions, the government presented testimony from Michael Ward, Chief of Security Forces Plans and Programs for the base at the time the dispute arose. Mr. Ward provided consistent testimony that a “NCIC wants and warrants check” is a term of art denoting a specific type of background check in the NCIC system, explaining that “[b]ackground check is a very generic term. Wants and warrants is what is titled out of the -NCIC check that provides the data that is being reviewed.” J.A. 316, 1. 17-317, 1. 2. He further explained that the NCIC wants and warrants check includes a search for criminal background information:
Q: What is your understanding of a wants and warrants check?
A: A wants and warrants check is the background check. Basically what it is, is it’s the information that is loaded into the actual 9-1-1—or the NCIC system. Probably the name, date of birth, Social Security Number, driver’s license number, or a combination of that information would reveal the background, any wants or warrants, registration in the—any formal programs such as sexual offender or violent offender programs and their criminal history would be listed as well.
J.A. 306, 11. 5-20 (emphases added). Mr. Ward also described an NCIC “wants and warrants check” and a “background check” as “synonymous.” J.A. 313,11. 15-20. Finally, he explained that Maj. Gen. Finan’s October 2007 memorandum was not a change to the base access policy. J.A. 315, 11.16-19 (“Q: Was this list [of those banned from the base in the October 2007 memo] different than your understanding of Malmstrom’s current policy described in the background paper? A: No, sir, it was not.”).
Maj. Gen. Finan’s testimony supports the testimony of Mr. Ward. During her testimony, Maj. Gen. Finan described an “unfavorable result,” which the access policy instructs should be scrutinized, as “convictions, arrests, you know, drug use, sex abuse, domestic abuse, anything like that, that would come up on the background check.” J.A. 295, 1. 18-296, 1. 5; see also J.A. 300, 1. 8-301, 1. 1. Garco makes much of Maj. Gen. Finan’s testimony that barring those with a criminal record from entering the base was a “large change” to the access policy. Appellant Br. 37 (quoting J.A. 153, 1. 17). But this testimony is less precise than Garco claims. It is unclear whether Maj. Gen. Finan meant that her October 2007 memorandum itself effected the change, or if the change was the institution of the base access policy her memorandum clarified. Indeed, only moments before mentioning the large change, Maj. Gen. Finan testified that allowing violent and sex offenders on the base would have been a “dramatic change” to the base access policy at the time she drafted her memorandum. J.A. 298, 11. 5-13; J.A. 284.
Ultimately, Maj. Gen. Finan’s less-than-clear testimony about a “large change” in the access policy—which, under Garco’s interpretation, is at odds with the rest of Maj. Gen. Finan’s testimony—does not render the Air Force’s interpretation of *945 the access policy plainly erroneous. Neither does the fact that Maj. Gen. Finan used the term “background check” in her memorandum instead of the term “wants and warrants check” as used in the access policy. The purpose of Maj. Gen. Finan’s memorandum was to clarify the base access policy, so it makes sense that she would use a different term than the one that was generating confusion.
Garco also argues that the Air Force’s interpretation is flawed in light of the fact that the contract incorporated FAR § 52.222-3, which permits contractors to employ ex-felons. We disagree that the incorporation of this provision makes the Air Force’s interpretation of the access policy inconsistent with the contract. For example, this provision could apply to JTC off-site employees who were not working on the base. Further, as Garco has acknowledged, the contract expressly required contractors to comply with the base access policy. And Garco does not dispute that Maj. Gen. Finan had the authority to ban ex-felons from entering the base. We therefore are not persuaded to draw the inference that Garco would have us draw from incorporation of the FAR provision.
After considering the ample support for the Air Force’s interpretation, we conclude that the interpretation is not plainly erroneous or inconsistent with the regulation, and we therefore must give it controlling weight. See Reizenstein, 583 F.3d at 1335. As a result, Maj. Gen. Finan’s October 2007 memorandum was not a change to the base access policy, but rather clarifying guidance on the existing policy, and the Board properly denied JTC’s REA on the basis of a changed base access policy.
II.
Garco also argues that the Air Force’s sovereign act effectuated a constructive acceleration of the contract. Although actions taken by the United States in its sovereign capacity shield the government from liability for financial claims resulting from those acts, the contractor may be allowed additional time to perform. See Conner Bros., 550 F.3d at 1371, 1380 (affirming Board’s ruling that the sovereign acts doctrine relieved the government of liability for damages but recognizing that the contractor received additional time to complete its project). Garco cites to a provision in the contract that allowed for delay in completing work if unforeseeable causes arose, including sovereign acts. Garco posits that by not allowing JTC to bring its more experienced workers on base, the Air Force compelled JTC to hire more workers, who had less experience and required training. Garco reasons that this additional hiring and training increased the time required to complete the work due under the contract.
This argument lacks merit. Our conclusion that the October 2007 memorandum was not a change to the base access policy significantly undermines Gar-co’s assertion that there was an unforeseeable action that impacted JTC’s work. But to the extent Garco argues that the unforeseeable action involved changes in the Air Force’s enforcement of its base access policy, which JTC contends the Air Force had not fully enforced during JTC’s' past contracts on the base, we also disagree that such action gives rise to constructive acceleration. The contract assigned the risk of adhering to Air Force regulations and orders to the contracting party. Thus, this risk must be borne by Garco.
In any event, Garco fails to make a prima facie case of constructive acceleration for an additional reason. Constructive acceleration typically requires a party to show both that it made a timely and sufficient request for a time extension and that *946 its request was denied. Fraser Constr. Co. v. United States, 384 F.3d 1354, 1361 (Fed. Cir. 2004). JTC never formally requested a time extension, and the government, therefore, could not have denied JTC’s nonexistent request.
Citing John Cibinic & Ralph Nash, Administration of Government Contracts 451 (3d ed. 1995), Garco asserts that a formal request for additional time is not always required if the parties understand there to be a request for additional time. First of all, the Cibinic & Nash treatise Garco cites indicates that “many cases” require “that the contractor have actually submitted a request fpr time extension,” which did not occur here. Cibinic & Nash at 451. Moreover, even if we were to accept Garco’s legal position, it would not save Garco’s constructive acceleration claim in this case. While JTC did submit an REA seeking additional money, there is no record evidence that any party interpreted that REA as also being a request for additional time. Further, while Cibinic & Nash cites a case from the Postal Service Board of Contract Appeals where an administrative judge held that a formal request is not always necessary when “there is a very clear indication from the contracting officer that no delay in the schedule will be tolerated,” id., such a “clear indication” did not occur here. For these reasons, we reject Garco’s constructive acceleration claim.
Conclusion
We have considered Garco’s remaining arguments and find them without merit. We affirm the decision of the Board denying Garco’s claims for contract damages.
AFFIRMED
Costs
Costs to Appellee.

. Maj. Gen. Finan was the rank of Colonel at the time, but has since been elevated to Major General. This opinion refers to Maj. Gen. Fi-nan by her elevated rank.

. Because Garco does not challenge the Board's determination that the base access policy is a sovereign act, and in fact agrees that the Air Force had the right to limit base access, see Oral Arg. at 2:17-2:31, we do not address the doctrine generally. Moreover, we do not address the issues raised by the dissent because Garco "failed to argue that the government did not satisfy the 'impossibility' requirement of the sovereign acts defense, [and thus] it has waived that argument for purposes of appeal." Conner Bros. Constr. Co. v. Geren, 550 F.3d 1368, 1379 (Fed. Cir. 2008). We disagree with the dissent's contention that the sovereign acts doctrine is a jurisdictional defense that cannot be waived'. Through the Contract Disputes Act, Congress waived the government’s sovereign immunity in this case, establishing the court’s jurisdiction. The sovereign acts doctrine, in contrast, has no effect on jurisdiction; it is, instead, an affirmative defense that serves only to prevent the United States from being "held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.” Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925) (emphasis added). Like other affirmative defenses ruled on by the Board, an appellant waives its right to challenge the Board's ruling by failing to raise the issue on appeal.