# United States Court of Appeals for the Federal Circuit

———————————

**FLIGHTSAFETY INTERNATIONAL INC.,**
*Appellant*

**v.**

**SECRETARY OF THE AIR FORCE**,
*Appellee*

———————————

2023-1700

———————————

Appeal from the Armed Services Board of Contract Appeals in No. 62659.

———————————

Decided: February 28, 2025

———————————

HOWARD WOLF-RODDA, Abrahams Wolf-Rodda, LLC, Potomac, MD, argued for appellant. Also represented by DANIEL BERNARD ABRAHAMS.

ANTHONY F. SCHIAVETTI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY; JOEL BERNARD LOFGREN, DAVID STARK, Commercial Litigation Field Center, United States Air Force, Joint Base Andrews, MD.

———————————

Before MOORE, *Chief Judge*, DYK and CUNNINGHAM, *Circuit Judges*.

DYK, *Circuit Judge*.

When the government acquires products or services from contractors, the government obtains rights to the technical data provided pursuant to the contract. The scope of the government's rights depends both on how development of that data was funded and the nature of the data. This case presents questions about the government's and a contractor's rights with respect to commercial technical data developed exclusively at private expense under federal acquisition statutes and the Defense Acquisition Regulation Supplement ("DFARS"), 48 C.F.R. § 200, et seq., and the rights of the contractor to place restrictive markings on its technical data.

The U.S. Air Force contracted with CymSTAR, LLC ("CymSTAR"), which in turn awarded two subcontracts to appellant FlightSafety International Inc. ("FlightSafety"), to provide flight simulation products and training services. In performing the subcontracts, FlightSafety supplied the government with commercial technical data that included various restrictive markings. The Air Force challenged the restrictive markings. The Armed Services Board of Contract Appeals ("Board") determined that, under the applicable statutes and regulations, the restrictive markings were improper. *See FlightSafety Int'l Inc.*, ASBCA No. 62659, 23-1 BCA ¶ 38,245.

FlightSafety appeals. We affirm.

## BACKGROUND

In August 2015, the Air Force entered a contract with CymSTAR to support the Training Systems Acquisition III program, "including the development, acquisition, and sustainment efforts needed to meet Air Force simulation and training requirements." 23-1 BCA ¶ 38,245 at 185,704. In October 2018, CymSTAR awarded subcontracts to

FlightSafety "for the supply and installation of a visual system replacement for the C-5 Aircrew Training System . . . including image generators, display management systems, and projectors for the C-5 weapon systems trainers at several Air Force installations in the United States." *Id.* FlightSafety's subcontracts with CymSTAR required FlightSafety to supply specific technical data to the government.

FlightSafety's subcontracts also incorporated several DFARS clauses that were included in CymSTAR's agreement with the Air Force, two of which are pertinent here: DFARS 252.227-7015 ("Commercial Data Clause"), and DFARS 252.227-7037 ("Validation Clause").

The Commercial Data Clause set forth the government's and a contractor's respective rights to commercial technical data developed exclusively at the contractor's private expense. *See* DFARS 252.227-7015.

The Validation Clause provided the procedures a contracting officer must use to challenge the validity of restrictive markings placed on technical data by a contractor. *See* DFARS 252.227-7037.[1]

In June 2018, FlightSafety delivered twenty-one drawings that included technical data to the Air Force. It is undisputed that the drawings pertained to commercial items or processes and were developed exclusively at private expense. FlightSafety initially marked its drawings with one

---

[1]    A separate clause, DFARS 252.227-7013 ("Noncommercial Data Clause"), set forth the government's rights to noncommercial technical data that the government has funded in whole or in part. The Noncommercial Data Clause additionally prescribed the content of restrictive legends that contractors may place on such government-funded data.

of two restrictive legends. The first legend ("Long Marking") read as follows:

> PROPRIETARY MATERIAL
> Copyright © 2014. All rights reserved.
> FlightSafety International Inc.
> This document, including the information contained herein, is confidential and/or proprietary to FlightSafety International Inc. It shall not be reproduced, distributed, or disclosed to others, except as expressly authorized in writing.

J.A. 6. The second legend ("Short Marking") read as follows:

> FlightSafety International Proprietary
> Rights Reserved

J.A. 6.

In July 2018, the Air Force notified FlightSafety that it disapproved of the restrictive legends. In October 2019, FlightSafety declined to remove the legends, arguing that the Air Force had no right to compel their removal. FlightSafety nonetheless proposed an alternate marking ("Alternate Marking"):

> FlightSafety Technical Data provided to the US. Government with unrestricted rights only pursuant to the requirements in CymSTAR Purchase Order PO003174-3 under US Government Contract #FA8621-15-D-6257, DO: FA8621-17-F-6255, the procedures specified in DFARS 252.227-7015 and limited by DFARS 227.7103-1.

J.A. 6.

In February 2020, the Air Force rejected FlightSafety's proposed Alternate Marking and announced that it would formally challenge FlightSafety's legends under the procedures set forth in the Validation Clause. According to the Air Force, FlightSafety's drawings constituted so-called

"OMIT" data because they were "necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data)." DFARS 252.227-7015(b)(1)(iv). The Air Force contended that FlightSafety's legends impermissibly "restrict[ed] the Government's right to use, modify, reproduce, release, or disclose the data." J.A. 342 ¶ 2. Specifically, the Air Force stated that the restrictions, were they to remain on the drawings, "would make it impracticable to procure the item to which the technical data pertain competitively at a later time." *Id.*

Thereafter, in accordance with the governing procedures under the Contract Disputes Act of 1978, 41 U.S.C. § 7101, et seq., FlightSafety submitted a formal request to the contracting officer to issue a final decision concerning the propriety of its restrictive markings. On June 18, 2020, the contracting officer issued a final decision finding FlightSafety's restrictive markings impermissible.

FlightSafety appealed to the Board, filing a three-count complaint. The first count alleged that, for commercial technical data developed exclusively at private expense, the government could only challenge the funding source of the data and not the markings themselves. FlightSafety's second count asserted that none of its three restrictive markings contradicted or limited the government's rights, and that even if its drawings were considered OMIT data, the government was precluded from using that data for future procurement purposes. The third count alleged that FlightSafety's drawings were not OMIT data.

FlightSafety later withdrew its third count pursuant to a settlement agreement between the parties. That agreement provided that the government was entitled to an "unrestricted right to use, modify, reproduce, release, perform, display, or disclose" eighteen of the disputed drawings "and to permit others to do so, to the same extent as the Government would if [the disputed drawings] were OMIT Data under DFARS § 252.227-7015(b)(1)." J.A. 582 ¶ 2. The

agreement also clarified that the parties previously had agreed that the remaining three drawings constituted OMIT data.

On cross-motions for summary judgment, the Board ruled for the government. *See* 23-1 BCA ¶ 38,245. The Board first rejected FlightSafety's argument that the government could not challenge the markings under the Validation Clause. *Id.* at 185,709–13. According to the Board, the plain meaning of the Validation Clause and its authorizing statute demonstrated that "the government may challenge restrictions even when it does not challenge whether the technical data was developed exclusively at private expense." *Id.* at 185,710. The Board further found that the legislative history of the Validation Clause's authorizing statute was "[a]mbiguous and [u]nhelpful" and, in any event, could not overcome the plain language of the "unambiguous statute." *Id.* at 185,712.

The Board next held that the parties' dispute about whether the Air Force obtained an unrestricted license to FlightSafety's data was resolved in part by the parties' settlement agreement. *Id.* at 185,713–14. The Board concluded that because FlightSafety agreed to permit the Air Force to use its drawings as if they were OMIT data, it granted the Air Force an unrestricted-rights license that allowed the Air Force to use the drawings for future procurements. *Id.* at 185,714–15.

In summary, the Board concluded that all three of the restrictive markings impermissibly restricted the government's rights under the contract. *See id.* at 185,723–26.

FlightSafety appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 7107(a)(1)(A).

## DISCUSSION

We review the Board's grant of summary judgment de novo. *Gates v. Raytheon Co.*, 584 F.3d 1062, 1067 (Fed. Cir. 2009). The interpretation of statutes, regulations, and

government contracts presents a question of law, which we also review de novo. *See Forman v. United States*, 329 F.3d 837, 841 (Fed. Cir. 2003).

I

We must first consider the scope and extent of the government's rights in FlightSafety's technical data supplied pursuant to the contracts.

The government's rights to technical data are defined in part by statute. *See* 10 U.S.C. § 2320.[2] The governing statute required the Secretary of Defense to "prescribe regulations to define the legitimate interest of the United States and of a contractor or subcontractor in technical data pertaining to an item or process." *Id.* § 2320(a)(1). The regulations adopted pursuant to the statute helped to define the government's rights in technical data. Both the statute and regulations were perhaps unduly complex, but we think they were nonetheless clear.

While this case involves commercial data, it is helpful to understand how the statute and regulations treated noncommercial data. In general, where noncommercial technical data had been exclusively funded at federal expense (not the situation here), the governing statute conferred

---

[2]    During the pendency of FlightSafety's appeal before the Board, Congress recodified and renumbered the relevant provisions of Title 10 from 10 U.S.C. §§ 2320–2321, to 10 U.S.C. §§ 3771–75, 3781–86. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1833, 134 Stat. 3388, 4225–34 (2021). The changes to these sections, including minor language changes, were non-substantive. The regulations promulgated under the former codifications were not affected by the changes. *See id.* §§ 1884–85, 134 Stat. at 4294. This opinion cites to the provisions as they were numbered at the time the parties' dispute arose.

upon the government the "unlimited right to—(i) use technical data pertaining to the item or process; or (ii) release or disclose the technical data to persons outside the government or permit the use of the technical data by such persons." *Id.* § 2320(a)(2)(A). The Noncommercial Data Clause clarified that the "unlimited right" provided in 10 U.S.C. § 2320(a)(2)(A) included the "rights to use, modify, reproduce, perform, display, release, or disclose technical data in whole or in part, in any manner, and for any purpose whatsoever, and to have or authorize others to do so." DFARS 252.227-7013(a)(16).[3] It is undisputed that where the government obtains unlimited rights in noncommercial technical data, it may use that data for future procurements under the Noncommercial Data Clause.[4]

---

[3]  As with the governing statutes, the DFARS provisions applicable to this case have been non-substantively amended during the pendency of this dispute. *See* DFARS: Definition of "Commercial Item" (DFARS Case 2018-D066), 88 Fed. Reg. 6578 (Jan. 31, 2023). This opinion uses the language in the regulations as it appeared at the time the parties' dispute arose.

[4]  In addition to describing the government's unlimited rights to federally funded noncommercial data, the Noncommercial Data Clause provided "government purpose" rights where the data at issue were partially funded by the government, DFARS 252.227-7013(b)(2), and further specified that the government obtains only "limited rights" to noncommercial data that were developed exclusively at private expense. DFARS 252.227-7013(b)(3) (emphasis added). Those limited rights are inapplicable here, as all agree that FlightSafety's drawings are commercial technical data. Appellant's Br. 25 ("The drawings here remain private commercial data regardless of the license rights the Government receives"); Appellee's Br. 51

On the other hand, where, as here, the data are commercial data that were funded exclusively at private expense, "the contractor or subcontractor <u>may restrict the right</u> of the United States to release or disclose technical data pertaining to the item or process to persons outside the government or permit the use of the technical data by such persons." *Id.* § 2320(a)(2)(B) (emphasis added).[5] However, this right-to-restrict did not extend to certain categories of technical data, including data that "is necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data . . .)," i.e., OMIT data. *Id.* § 2320(a)(2)(C)(iii). Thus, where the government obtains rights to privately funded, commercial OMIT data, it enjoys an "unrestricted" right to that data. The Board found that the data in dispute were OMIT data.[6]

In accordance with the statute, the Commercial Data Clause established a two-tier licensing scheme, whereby the government received an "unrestricted" license to certain categories of data including OMIT data, and a more limited license to all other categories of privately funded commercial data:

---

(describing FlightSafety's drawings as "commercial technical data").

[5] The statute did not make a distinction between "commercial" and "noncommercial" data that have been developed exclusively at private expense. However, the statute's implementing regulations did make such a distinction.

[6] The statute distinguished between OMIT data and "detailed manufacturing or process data." 10 U.S.C. § 2320(a)(2)(C)(iii). There is no contention here that FlightSafety's drawings constitute detailed manufacturing or process data.

(b) License.

(1) The Government shall have the <u>unrestricted right</u> to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so, that—

. . .

(iv) Are necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data) [OMIT data]

. . .

(2) <u>Except as provided in paragraph (b)(1) of this clause</u>, the Government may use, modify, reproduce, release, perform, display or disclose technical data within the Government only.  The Government shall not—

(i) Use the technical data to manufacture additional quantities of the commercial items[.]

DFARS 252.227-7015 (emphases added).

FlightSafety asserts that, regardless of the government's "unrestricted" right to use OMIT data under paragraph (b)(1) of the Commercial Data Clause, the government may not use commercial OMIT data that have been developed exclusively at private expense for future procurements. Appellant's Br. 51–53. FlightSafety relies primarily on its interpretation of the Commercial Data Clause. According to FlightSafety, the clause only allows the government to use OMIT data for OMIT purposes— that is, for "operation, maintenance, installation, and training." *Id.* at 53–55.

FlightSafety points out that the Commercial Data Clause did not explicitly grant the government an "unlimited right," unlike the Noncommercial Data Clause. Although the Commercial Data Clause granted the government an unrestricted right to "use, modify, reproduce, release, perform, display, or disclose" OMIT data, DFARS 252.227-7015(b)(1)(iv), it did not expressly grant the government the "unlimited" right to use OMIT data "in any manner, and for any purpose whatsoever," as in the Noncommercial Data Clause, DFARS 252.227-7013(a)(16). We agree with most commentators that there is no meaningful difference between the "unlimited rights" in the Noncommercial Data Clause and the "unrestricted rights" in the Commercial Data Clause.[7]

In any event, quite apart from its reliance on this minor language difference between clauses, FlightSafety's other arguments misread the Commercial Data Clause. Paragraph (b)(1) of the Commercial Data Clause granted the government unrestricted rights to OMIT data. FlightSafety's theory is that those rights were restricted by paragraph (b)(2), which stated that, "[e]xcept as provided in paragraph (b)(1)," the government shall not "[u]se the

---

[7]    *See* Leonard Rawicz, *Commercial Items Technical Data Policy Revisited: Understanding the DFARS* Policy, 28 NASH & CIBINIC REP. ¶ 27 (May 2014) ("The unrestricted rights license is similar to the 'unlimited rights' license."); Fed. Cir. Bar Ass'n Comm. Members, *Study of Best Practices and Opportunities for Improvements in Federal Procurement Contracting*, 24 FED. CIR. B.J. 319, 326 (2015) ("Unrestricted rights in the technical data delivered to DOD with commercial items pursuant to the DFARS 7015 clause are essentially the same as the unlimited rights license that DOD obtains in noncommercial technical data that pertains to an item, component, or process developed at government expense.").

technical data to manufacture additional quantities of the commercial items." DFARS 252.227-7015(b)(2)(i).

FlightSafety's interpretation is incorrect. Since paragraph (b)(1) gave the government unrestricted rights in OMIT data, the obvious implication of the "except" clause in paragraph (b)(2) was that the prohibitions appearing in paragraph (b)(2) did not apply to the categories of data described in paragraph (b)(1), and that the government could use paragraph (b)(1) data, including OMIT data, for further procurement purposes. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)). Under the Commercial Data Clause, what mattered was the category of data at issue and, being paragraph (b)(1) data, OMIT data were not subject to the procurement prohibition.

Our understanding that the manufacturing restriction did not apply to commercial, privately funded OMIT data is further confirmed by other language in the statute and the regulations. Section 2320(a)(2)(B) of the statute authorized contractors to "restrict" the government's rights to "technical data pertaining" to "an item or process that is developed . . . exclusively at private expense," but Section 2320(a)(2)(C) made clear that this authorization did not extend to certain categories of data—including OMIT data—which the statute defined by the character of the data, not the purpose for which that data may be used. 10 U.S.C. § 2320(a)(2)(B)–(C).

A separate regulation that also delineated the government's "rights in technical data" explained that, under the Commercial Data Clause, the data provided to the government ordinarily "may not be used to manufacture additional quantities of the commercial items."

DFARS 227.7102-2(a). But "[t]hose restrictions do not apply to the technical data described in [DFARS] 227.7102-1(a)." *Id.* The "technical data described" in the cross-referenced regulation included OMIT data. *See* DFARS 227.7102-1(a)(2) ("DoD shall acquire only the technical data customarily provided to the public with a commercial item or process, except technical data that . . . [a]re required for repair or maintenance of commercial items or processes, or for the proper installation, operating, or handling of a commercial item . . . ." (emphasis added)).

The question remains as to whether the twenty-one drawings in dispute constitute OMIT data. The parties agree that three of FlightSafety's drawings are OMIT data. As to the other eighteen drawings, the government acquired the right to use FlightSafety's technical data for further procurement purposes because the parties' settlement agreement provided that the eighteen drawings would be treated as OMIT data. Specifically, the agreement stipulated that the government may use FlightSafety's drawings "to the same extent as the Government would if the [drawings] were OMIT data." J.A. 582 ¶ 2 (emphasis added). We see no merit to FlightSafety's argument that there is a meaningful difference between an agreement that the drawings in fact constitute OMIT data and an agreement to treat the drawings as if they were OMIT data.

## II

We next consider whether the government could challenge FlightSafety's restrictive markings placed on the twenty-one drawings. FlightSafety argues that 10 U.S.C. § 2321 only allowed the government to challenge the funding source of privately developed commercial data, and that since there is no challenge to the funding source of FlightSafety's data, the government was not permitted to contest FlightSafety's restrictive markings. FlightSafety's position ignores the plain language of the statute.

Section 2321 set forth a procedure to be followed by the government and contractors when they dispute the propriety of restrictive markings. *See* 10 U.S.C. § 2321. Section 2321(d)(1) broadly provided that:

> The Secretary of Defense <u>may challenge</u> a use or release restriction asserted with respect to technical data by a contractor or subcontractor at any tier under a contract subject to this section if the Secretary finds that—
>
> > (A) <u>reasonable grounds</u> exist to question the current validity of the asserted restriction[.]

*Id.* § 2321(d)(1) (emphases added).

Notably, Section 2321(d)(1) did not limit the government's authority to bring challenges to restrictive markings based on the data's commercial or noncommercial character or its funding source. But FlightSafety argues that Section 2321(f) cabined the government's rights. Subsection (f) provided:

> Presumption of development exclusively at private expense. In the case of a challenge to a use or release restriction that is asserted with respect to technical data of a contractor or subcontractor under a contract for commercial products, the contracting officer shall presume that the contractor or subcontractor has justified the restriction on the basis that [the] commercial product[] was developed exclusively at private expense, whether or not the contractor or subcontractor submits a justification in response to the notice provided pursuant to subsection (d)(3). <u>In such a case, the challenge to the use or release restriction may be sustained only if information provided by the Department of Defense demonstrates that [the] commercial product[] was not developed exclusively at private expense.</u>

10 U.S.C. § 2321(f) (emphasis added).

In FlightSafety's view, the "only if" language limited the government's ability to challenge markings placed on privately funded technical data only to the situation where the government showed that the "commercial product[] was not developed exclusively at private expense." *Id.* To illustrate the point, at argument counsel for FlightSafety represented that, under its view, the government could not challenge a restrictive legend stating that the government "has no rights to this drawing" if the drawing was developed exclusively at private expense. Oral Arg. at 8:58–9:15.

FlightSafety's interpretation would effectively defeat the government's rights in technical data by, for example, allowing the contractor to insert a marking that states the government has "no rights" to the data. This is because the government "shall . . . be bound" by any restrictive marking that it has not successfully invalidated pursuant to the challenge procedures provided by the statute. 10 U.S.C. § 2321(i)(2)(A).

Because FlightSafety's position would conflict with the statute, it cannot be correct. *See Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012) (adopting construction of statutory term in part "because Congress meant (as it usually does) for the provision it enacted to fit within the statutory scheme").[8] The language of

---

[8]    *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 608 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve."); *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 393 (2015) (rejecting interpretation that "could defeat the purpose of the whistleblower statute"); *see also Pitsker v. Off. of Pers. Mgmt.*,

Section 2321(f) was not to the contrary. The heading made clear that the subsection concerned a "[p]resumption of development exclusively at private expense." 10 U.S.C. § 2321(f). The reference to "the challenge" in subsection (f) was obviously to the challenge based on the funding source of the data, not to challenges to restrictive markings generally. The language is properly read as stating: "[i]n such a case, the challenge to the use or release restriction [based on it not being developed solely at private expense] may be sustained only if information provided by the Department of Defense demonstrates that [the] commercial product[] was not developed exclusively at private expense." *Id.* This reading most naturally "fit[s] within the statutory scheme" enacted by Congress, *Caraco Pharm. Lab'ys,* 566 U.S. at 416, and demonstrates that the statute simply set forth a presumption to be observed, and possibly rebutted upon a sufficient showing of evidence, by the government when challenging markings based on the funding source of the data. *See* 10 U.S.C. § 2321(f). The provision did not, as FlightSafety suggests, constrain the government to bringing only one form of challenge against restrictive markings placed on privately funded data.

We are not persuaded by FlightSafety's arguments to the contrary based on legislative history. FlightSafety contends that subsection (f) was adopted by Congress to "encourage[] commercial contracting, in part, by exempting commercial contractors from requirements to provide technical data or rights in such data . . . 'unless the government could prove that an item was developed at government

---

234 F.3d 1378, 1381 (Fed. Cir. 2000) ("[W]e must 'find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.'" (quoting *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297 (1957)).

expense.'"  Appellant's Br. 17 (quoting H.R. REP. NO. 103-712, pt. 2 (1994) (Conf. Rep.), 1994 U.S.C.C.A.N. 2607, 2664); *see also id.* at 26–28.

The legislative history cannot contradict what is apparent on the face of the statute.  *See Res-Care, Inc. v. United States*, 735 F.3d 1384, 1389 (Fed. Cir. 2013); *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("If the statute is clear and unambiguous, then the plain meaning of the statute is conclusive . . . .").

With respect to the regulations, FlightSafety argues that the Validation Clause confirmed its understanding of Section 2321 because a portion of the Validation Clause implemented the requirements of Section 2321(f).  FlightSafety contends that its position is further supported by the Noncommercial and Commercial Data Clauses because the Noncommercial Data Clause included express provisions for the government to challenge a contractor's restrictive markings, whereas the Commercial Data Clause did not.

FlightSafety's regulatory arguments fare no better than its statutory arguments.  The Validation Clause did no more than implement the requirements of Section 2321.  Neither party suggests that the text of the Validation Clause deviated in any meaningful way from the text of Section 2321, so our analysis of the statute applies with full force to the regulatory text.

Indeed, the regulations were even clearer than the statute itself.  Contracting officers were directed to include the Validation Clause in contracts covering commercial technical data.  *See* DFARS 227.7102-4(c) ("Use the [Validation Clause] in solicitations and contracts . . . for the acquisition of commercial items . . . ."); DFARS 252.227-7037 ("As prescribed in 227.7102-4(c) . . . use [the Validation Clause]").  Moreover, a separate clause applicable to commercial data, DFARS 227.7102-3, incorporated another provision that clarified that the "Government <u>has the right</u>

to challenge asserted restrictions when there are reasonable grounds to question the validity of the assertion," without limiting the grounds for such a challenge to the source of funding for the data. DFARS 227.7103-13(a) (emphasis added).[9]

In sum, we affirm the Board in its ruling that neither the authorizing statute nor the Validation Clause itself limited the government to challenging only the funding source of privately funded data marked with restrictive legends. The challenge right extended to challenges on the ground that a contractor's restrictive markings limit the government's data rights.

## III

We next consider whether the Board erred in determining that FlightSafety's restrictive markings were impermissible because they contradicted the government's rights.

## A

We first address FlightSafety's Long Marking, which provided:

---

[9]   FlightSafety additionally argues that, even if the government may bring a challenge to its restrictive markings, it cannot invalidate those markings or order their removal. This argument is foreclosed by the language of the Validation Clause itself, which described the circumstances under which the government may "cancel or ignore" improper markings. DFARS 252.227-7037(g)(2)(ii). Notably, "[t]he restrictive markings on the technical data shall be <u>cancelled, corrected or ignored</u>" if the government's challenge is sustained "upon final disposition of [any] appeal or suit" the contractor may file. DFARS 252.227-7037(h)(i) (emphasis added).

PROPRIETARY MATERIAL
Copyright © 2014. All rights reserved.
FlightSafety International Inc.
This document, including the information contained herein, is confidential and/or proprietary to FlightSafety International Inc. It shall not be reproduced, distributed, or disclosed to others, except as expressly authorized in writing.

J.A. 6.

FlightSafety argues that its use of the term "proprietary" was neither ambiguous nor confusing, contrary to the Board's decision. FlightSafety suggests that the term merely comports with the "common understanding and widespread use" of the word, which applies to "confidential and trade secret information that must be protected from disclosure by those who have no license rights to disclose them." Appellant's Br. 44. FlightSafety cites to Department of Defense Instruction ("DoDI") 5230.24 in support, *id.* at 44–45 n.10, which defined "proprietary information" as:

> Information relating to or associated with a company's products, business, or activities, including, but not limited to, financial information; data or statements; trade secrets; product research and development; existing and future product designs and performance specifications; marketing plans or techniques; schematics; client lists; computer programs; processes; and knowledge that have been clearly identified and properly marked by the company as "proprietary information," trade secrets, or company confidential information.

DoDI 5230.24, Glossary, at 29. Under the Instruction's guidance, "proprietary information 'is received with the understanding that it will not be routinely transmitted outside the U.S. Government.'" Appellant's Br. 45 n.10 (quoting DoDI 5230.24, Glossary, at 29).

The government counters that the word "proprietary" in FlightSafety's legend would require "'any authorized users . . . to treat the data as subject to confidential and trade secret protection,'" thus contradicting the government's unrestricted rights to FlightSafety's drawings. Appellee's Br. 57 (quoting J.A. 38).

We agree with the government and the Board that the word as used in the Long Marking contradicted the government's rights. *See* 23-1 BCA ¶ 38,245 at 185,724. Even by FlightSafety's own definition, the term "proprietary" indicated a need for the government to treat the disputed drawing as confidential or to refrain from "routinely transmit[ing] [the data] outside the U.S. Government." DoDI 5230.24, Glossary, at 29. This plainly would contradict the government's "unrestricted right" to use and disclose FlightSafety's OMIT data. The same problem, of course, exists with the term "confidential" in the Long Marking.

FlightSafety next defends the "except as expressly authorized in writing" provision of the Long Marking on the ground that it did not contradict the government's rights because "the Commercial Clause is the very express authorization envisioned in the restriction." Appellant's Br. 47.

FlightSafety's argument strains credulity. On its face, the phrase contemplated individualized written authorization by FlightSafety. Neither the statute nor the Commercial Data Clause contemplated written authorization for the government's use of OMIT data. FlightSafety's requirement for such authorization in its Long Marking thus contradicted the statutory scheme and the government's unrestricted rights in FlightSafety's drawings.

FlightSafety next suggests that the copyright notice in its Long Marking was permissible because the Noncommercial Data Clause "permit[ted] a copyright notice under any circumstance in addition to the legends that are

variously prescribed dependent on the Government's rights." Appellant's Br. 47 (emphasis omitted) (citing DFARS 252.227-7013(f)). If a copyright notice was permissible under the "highly prescriptive Noncommercial [Data] Clause," FlightSafety reasons, a copyright notice must also be permissible under the less restrictive Commercial Data Clause because the Commercial Data Clause was silent as to which legends a contractor may use in marking its data. *Id.* at 48. FlightSafety further argues that under our decision in *Boeing v. Secretary of the Air Force*, 983 F.3d 1321 (Fed. Cir. 2020), "a copyright notice is always permissible if it is permissible under the [c]opyright statutes." Appellant's Br. 48.

FlightSafety's reliance on the Noncommercial Data Clause is misplaced. The copyright notice in FlightSafety's Long Marking was impermissible because the notice and its surrounding text did not recognize that the government possessed a copyright license to the data. Without such a recognition, the copyright notice was misleading and therefore contradicted the government's unrestricted rights to the data. In this way, FlightSafety's copyright notice was similar to an "unjustified marking" as defined in relation to noncommercial data. An unjustified marking is "an authorized marking that does not depict accurately restrictions applicable to the Government's use, modification, reproduction, release, performance, display, or disclosure of the marked technical data." DFARS 227.7103-12(b)(1). Although this definition is not strictly applicable to FlightSafety's commercial data, it is a helpful guide to the problems presented by FlightSafety's copyright notice.

FlightSafety also misapprehends our *Boeing* decision. In that case, Boeing placed the following restrictive marking on the noncommercial data it provided to the government:

```
NON-U.S. GOVERNMENT NOTICE.
BOEING PROPRIETARY
  THIRD PARTY DISCLOSURE REQUIRES WRITTEN APPROVAL.
COPYRIGHT 2016  BOEING
UNPUBLISHED WORK – ALL RIGHTS RESERVED

NON-U.S. GOVERNMENT ENTITIES MAY USE AND DISCLOSE ONLY AS
PERMITTED IN WRITING BY BOEING OR BY THE U.S. GOVERNMENT
```

*Boeing*, 983 F.3d at 1325. The government contended the legend was impermissible because it did not adhere to the legends explicitly authorized by the Noncommercial Data Clause. *See id.* at 1327. We rejected the government's position, concluding that the enumerated legends and their associated restrictions in the Noncommercial Data Clause applied "only in situations when a contractor seeks to assert restrictions on the government's rights." *Id.* at 1329. That was not the situation in *Boeing*, where the copyright notice was explicitly directed only to third parties. *See id.*

We nonetheless explained that "a notice of copyright is a legend that restricts the government's rights," because "the government's need for a copyright license serves as the very indication that the government could, under certain circumstances, be subject to a suit for copyright infringement under 28 U.S.C. § 1498 if it exceeds the scope of its license." *Id.* at 1328; *see, e.g.*, *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 951 (Fed. Cir. 2021) (affirming finding of copyright infringement where Navy exceeded scope of implied-in-fact copyright license). We did not decide whether Boeing's copyright notice did, in fact, restrict the government's rights, and therefore did not ultimately determine whether Boeing's legend was permissible under the Noncommercial Data Clause. We remanded the case to the Board to decide whether Boeing's legend restricted the government's rights in the first instance. *See Boeing*, 983 F.3d at 1333–34.

The copyright notice in FlightSafety's Long Marking was materially different from the notice at issue in *Boeing*. Unlike the notice in *Boeing*, nothing in FlightSafety's Long Marking purported to limit the copyright notice to the

conduct of third parties. Instead, FlightSafety's Long Marking was directed to <u>all</u> parties, whether governmental or not. Given this, the Board correctly found that FlightSafety's copyright notice impermissibly contradicted the government's unrestricted rights license in FlightSafety's OMIT data. *See* 23-1 BCA ¶ 38,245 at 185,725.

B

We next consider the propriety of FlightSafety's Short Marking, which provided:

> FlightSafety International Proprietary
> Rights Reserved

J.A. 6.

As with the appearance of the term "proprietary" in the Long Marking, the presence of the word "proprietary" in the Short Marking implied a need for government recipients of the data to treat FlightSafety's drawings as confidential and to limit wider dissemination. Such limitations on the government's use of FlightSafety's OMIT data clearly contradicted the government's unrestricted rights in that data.

The reservation of rights in FlightSafety's Short Marking was likewise problematic because it did not specify which rights were reserved nor which rights were granted to the government. Such ambiguous restrictions impermissibly limited the government's unrestricted rights in the data. *See* DFARS 252.227-7015(b)(1).

C

We finally address FlightSafety's Alternate Marking, which provided:

> FlightSafety Technical Data provided to the US. Government with unrestricted rights only pursuant to the requirements in CymSTAR Purchase

> Order PO003174-3 under US Government Contract #FA8621-15-D-6257, DO: FA8621-17-F-6255, the procedures specified in DFARS 252.227-7015 and limited by DFARS 227.7103-1.

J.A. 6.

FlightSafety defends this marking primarily on the ground that it recognized that its drawings were "provided to the U[.]S. Government with unrestricted rights." Appellant's Br. 49 (quoting J.A. 6). FlightSafety claims that this was the "most significant[] phrase of the legend," and that the additional terms should be disregarded because they "merely recited the source of, and did not limit, the Government's rights." *Id.* We disagree.

Notwithstanding the Alternate Marking's acknowledgment of the government's "unrestricted rights" to FlightSafety's drawings, the marking purported to subject the government's use of those drawings to "the procedures specified in DFARS 252.227-7015 and limited by DFARS 227.7103-1." J.A. 6. Neither of these provisions applied to FlightSafety's data, so these citations contradicted the government's rights.

For example, there were two "procedures specified in DFARS 252.227-7015" (the Commercial Data Clause). Neither procedure applied to OMIT data. The first applied to the data described in paragraph (b)(2) and required the government to obtain written approval from the contractor before the government could "[r]elease, perform, display, disclose, or authorize use of the technical data outside the Government." DFARS 252.227-7015(b)(2)(ii). The second required that, where the government intended to share paragraph (b)(2) data with "covered Government support contractors," the government must have first provided pre-disclosure notice to the contractor, and the procedure further entitled the contractor to require that any new non-governmental recipient of the data sign a non-disclosure agreement.     DFARS     252.227-7015(b)(3)     (limiting

application of procedure to "[t]echnical data covered by paragraph (b)(2) of this clause"); DFARS 252.227-7015(b)(2)(ii) (similar).

As for the second citation in the Alternate Marking, DFARS 227.7103-1, that provision stated the Department of Defense's policy with respect to <u>noncommercial</u> products, services, or processes. *See* DFARS 227.7103-1. It had no application to FlightSafety's <u>commercial</u> technical data. Citation to these inapplicable provisions simply served to confuse the scope of the government's rights and for that reason, the Alternate Marking was impermissible.

We are not saying that contractors cannot place restrictive markings on their privately funded commercial data, so long as those markings accurately describe the government's rights in that data. Contractors obviously need to place such restrictive markings on their data to preserve their rights. *See* 10 U.S.C. § 2320(a)(2)(C)(iv); DFARS 252.227-7015(d) ("The Contractor agrees that the Government . . . shall have no liability for any release or disclosure of technical data that are not marked . . . ."). We hold only that markings that impair the government's rights are impermissible.

## CONCLUSION

FlightSafety's restrictive markings were improper, and the Board properly sustained the government's challenge.

## **AFFIRMED**

### Costs

No costs.