ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Al Ghanim Combined Group W.L.L. | ) | ASBCA Nos. 62321, 62984 |
| | ) | |
| Under Contract No. W912ER-14-D-0005 | ) | |

APPEARANCE FOR THE APPELLANT:        Sam Zalman Gdanski, Esq.
  Gdanski Law PC
  Teaneck, NJ

APPEARANCES FOR THE GOVERNMENT:        Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
  Cara M. Mroczek, Esq.
  Ken T Kajihiro, Esq.
  Aimee L. Rippeon, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Middle East

OPINION BY ADMINISTRATIVE JUDGE HERZFELD

     Al Ghanim Combined Group W.L.L. (Al Ghanim) seeks its delay costs from the United States Army Corps of Engineers (Army Corps) for awaiting the arrival of security escorts before it could travel to do construction work at two buildings at Camp Ali Al Salem, Kuwait, in 2018.  The parties submitted the appeals on the record under ASBCA Rule 11.  For the reasons discussed below, we sustain Al Ghanim's appeal in the amount of $34,320.11, plus applicable Contract Disputes Act (CDA) interest.

FINDINGS OF FACT

I.    *The Contract and the Security Escort Process*

     On November 7, 2013, the Army Corps awarded Al Ghanim an indefinite delivery/indefinite quantity job order contract (Contract) to perform "sustainment, restoration, and modernization . . . projects at installations in Kuwait" (62321 R4, tab 3 at 3; 62984 R4, tab 5 at 3).  On September 29, 2017, the Army Corps awarded two task orders to Al Ghanim to perform minor construction and repair work at Camp Ali Al Salem's Joint Logistics Operations Center Facility A office (JLOC-A) and Joint Logistics Operations Center Facility B office (JLOC-B) (62321 R4, tab 12 at 2 (JLOC-

A); 62984 R4, tab 7 at 3 (JLOC-B)). The task orders included a contract completion date of July 16, 2018 (62321 R4, tab 12 at 3; 62984 R4, tab 7 at 4).

To perform the task orders necessarily required Al Ghanim to work on-site at Camp Ali Al Salem in Kuwait. The base's Air Force wing served "as the primary airlift hub and gateway for delivering combat power to joint and coalition forces in the U.S. Central Command Area of Responsibility" (supp. R4, tab 28 at 1; tab 29 at 1). The air base is located approximately 39 miles from the Iraqi border (supp. R4, tab 29 at 1; tab 27).

Before the parties entered the contract, the Air Force's Commander of the Ninth Air Force had issued an order requiring military escorts while on base: "All [local national/other country national] personnel under [United States Air Force] control and performing contracted services require escort unless the wing commander deems otherwise" (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002); tab 36 – Lantz decl. ¶ 4).[1] This order – Air Force Central Instruction 32-1002 – applied to "all Air Force military, civilian, and contracted personnel" of the Ninth Air Force "while deployed to the" United States Central Command area of responsibility, which included Camp Ali Al Salem (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002); tab 36 – Lantz decl. ¶ 4). The instruction's "Commander's Intent" section explained that "escorts are needed for [local national], [other country national] and contract employees in areas containing essential personnel, equipment, or information that must be protected from sabotage or disclosure to enemy forces" (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002)). However, later in the instruction under the "Personnel Requiring Escort" section, it clarified that it only applied to contracting personnel: "All [local national/other country national] personnel under USAF control and performing contracted services require escort unless the wing commander deems otherwise" (id.). The order also warned service members that "[f]ailure to comply is a potential violation" of the Uniform Code of Military Justice (id.).

Consistent with the order, the Contract warned that "[a]ll work under this contract is to be accomplished on secure sites," which meant "[c]ontractor personnel and work crews shall be required to be in the presence of Government Escorts at all times they are on the installations" (62321 R4, tab 3 at 53-54; 62984 R4, tab 5 at 53-54). The Contract further explained, "Security requirements and restrictions are for the specific purpose of protecting the security and force protection interests of the government. Protecting these interests will at all times take precedence over the accomplishment of the work under this contract." (62321 R4, tab 3 at 54; 62984 R4,

---

[1] The Army Corps provided a 2021 version of Air Force Instruction 32-1002, but explained by declaration that this version is "substantively similar" to the version in effect in 2018 at the time the Al Ghanim escorts at issue took place (supp. R4, tab 36 – Lantz decl. ¶ 4). Al Ghanim has not disputed these facts.

tab 5 at 54)  The Contract also warned, "The capacity of the government to provide Escorts is limited, and subject to unavoidable shortages" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).  "Work and work schedule shall be required to be adjusted in accordance with the Government's ability to provide Escorts" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).

The Contract set up a process for Al Ghanim to obtain escorts (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).  The Contract required Al Ghanim to "provide the Contracting Officer with a twice per week report (in writing) with projections of manpower to be working on a daily basis . . . . to obtain accurate estimates weekly in order that the number of Government Escorts can be planned and provided to meet Contractor work requirements" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).  "No later than 1200 hours each day, Contractor shall provide the Contracting Officer with an accurate report as to numbers of personnel, crews and crew sizes to be working on the following work day, and shall confirm that the required escorts will be available" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).

The Contract indicated that site locations requiring escorts "[m]ost commonly . . . pertain to U.S. Air Force and they shall provide escorts" (62321 R4, tab 3 at 56; 62984 R4, tab 5 at 56).  As anticipated by the Contract, the Air Force conducted the escorts at Camp Ali Al Salem and required Al Ghanim to submit escort request forms (app. R11 br., ex. F; supp. R4, tab 30; tab 33 at 50 (Al Ghanim representative acknowledging Air Force provided escorts)).  The escort forms stated:  "An escort request does not guarantee availability" (app. R11 br., ex. F at 147; supp. R4, tab 30).

As part of the bidding process on the Contract, contractors (including Al Ghanim) had to submit a price based on a coefficient, which meant "a numerical factor that represents costs not considered to be included in 'Unit Price Book' unit prices" that were provided as an attachment to the Contract (62321 R4, tab 3 at 37, 39; 62984 R4, tab 5 at 37, 39).  "Coefficients shall consist of items such as:  general and administrative and other overhead costs, insurance costs, bonding and alternative payment protection costs, protective clothing, equipment rental, sales tax and compliance with tax laws and also contractor's profit, as applicable" (62321 R4, tab 3 at 39; 62984 R4, tab 5 at 39).  The Contract also stated, "In formulating his proposal for the coefficients, Contractor will consider and account for the cost implications inherent in accomplishment of work on secure installations" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54).  The Contract specifically stated that it should include all costs of "complying with security measures including obtaining host nation gate passes, DBIDS [Defense Biometric Identification System] Registration . . . Local Employed Personnel (LEP) interviews, processing times through vehicle search area both in and out of base, and complying with escort policies" as part of the coefficients (62321 R4, tab 3 at 40; 62984 R4, tab 5 at 40).  Al Ghanim's coefficients factored in all these security requirements including delays of up to 30 minutes to account for the

3

contractor's completion of all required on-base processing at the facility and when government escorts would be available to shepherd the contractor around the base to conduct work (app. R11 br., Lakshmi aff. ¶¶ 9, 15; 62321 R4, tab 3 at 9-11; 62984 R4, tab 5 at 9-11).

II.     *Delays During Performance*

Consistent with the Contract, Al Ghanim submitted escort request forms in advance of days the contractor planned to work (app. R11 br., ex. F).  Al Ghanim usually identified the time it would arrive at the Visitor Control Center and the time 30 minutes later when the Air Force would need to provide the security escort (*id.*).[2] Air Force enlisted personnel with the force protection unit regularly coordinated with and approved Al Ghanim's escort requests, usually stating that the force protection unit could "accommodate" the escort request (*id.*; supp. R4, tab 38 – Nichols decl. ¶ 6 (officer noting that he was sometimes copied on escort requests, but he was not part of the force protection unit).  Al Ghanim copied the Army Corps when it submitted its security escort requests and the Corps' project manager "actively monitored" the force protection process in an attempt to avoid or mitigate delays (supp. R4, tab 35 – Heffern decl. ¶¶ 13-15).

Each day, Al Ghanim personnel and equipment had to present their base access badges and to pass through the vehicle and contractor security checkpoint at the Visitor Control Center before joining the security escorts (supp. R4, tab 40 – Yassin decl. ¶¶ 5-8; tab 35 – Heffern decl. ¶¶ 6-10).  The Army Corps' contracting officer's representative agrees with Al Ghanim that this process normally took about 30 minutes (supp. R4, tab 40 – Yassin decl. ¶ 11).  Thus, we find this 30-minute estimate to be reasonable.

During performance, Al Ghanim notified the contracting officer that it was encountering weather and government-caused delays for both the JLOC-A and JLOC-B task orders (supp. R4, tab 7 at 20, 22; 62321 R4, tabs 46, 47, 52; 62984 R4, tabs 40, 51).  As to government-caused delays, Al Ghanim explained:  "Nearly every time[,] the escort arrives late at the [Visitor Control Center] to pick up our crew, consequently our crew reaches late to the site" (62321 R4, tab 49 at 1; 62984 R4, tab 47 at 1).  The government had approved Al Ghanim's escort requests for a particular time but frequently did not come at the specified time to escort Al Ghanim's personnel to the site (supp. R4, tab 33 – Krishna tr. at 58; app R11 br., ex. F).  On its daily quality

---

[2] The record is missing escort request forms for March 10-31, 2018, April 1-2, 4-15, 23-30, 2018, May 1-3, 5-8, 12-15, 2018, for the JLOC-A crew; and March 12-31, 2018, April 1-2, 5-15, 23-30, 2018, and May 1-3, 5-8, 12-15, 2018, for the JLOC-B crew (supp. R4, tab 39 – Witherington decl. ¶ 25(f)(v); tabs 39e, 39f (orange highlighted); app. R11 br., ex. F).

control reports, Al Ghanim noted when Al Ghanim's personnel arrived at the Visitor Control Center, when the security escort arrived at the Visitor Control Center (for most days), and when Al Ghanim arrived at the work site that day (app. R11 br., exs. A.4, A.5). On some days, however, Al Ghanim's personnel arrived at the Visitor Control Center later than the agreed-to time (supp. R4 tab 39 – Witherington decl. ¶ 12(k)(v); tabs 39e & 39f (gray highlighted days); app. R11 br., ex. F; ex. A.4 at 668, 776-78, ex. A.5 at 135, 460, 568-669).

III.     *Al Ghanim's Requests for Equitable Adjustment and Claims Seeking Costs for Security Escort Delays*

On November 18, 2018, Al Ghanim submitted two documents styled as requests for equitable adjustment seeking time extensions and costs for security escort and weather delays from January through October 2018 (62321 R4, tab 57; 62984 R4, tab 3). For JLOC-A, Al Ghanim requested a 41-day time extension and costs of $206,621.96 (62321 R4, tab 57 at 1). For JLOC-B, Al Ghanim also requested a 41-day time extension and costs of $206,328.89 (62984 R4, tab 3 at 1). For each day on which Al Ghanim alleged a delay, Al Ghanim broke its delay costs into four items: (1) technical staff and manpower costs; (2) equipment costs; (3) indirect extended overhead costs; and (4) other indirect expenses (62321 R4, tab 57 at 9-368; 62984 R4, tab 3 at 10-364). Al Ghanim certified each request as required by the Requests for Equitable Adjustment clause, Defense Federal Acquisition Regulation Supplement (DFARS) 252.243-7002 (DEC 2012) (62321 R4, tab 57 at 2; 62984 R4, tab 3 at 2; 62321 R4, tab 3 at 23 (Contract incorporating DFARS clause); 62984 R4, tab 5 at 23 (same)).

For the first several months of 2019, representatives from Al Ghanim and the Army Corps met and attempted to negotiate a resolution to Al Ghanim's requests for equitable adjustment (supp. R4, tabs 16, 17; tab 40 – Yassin decl. ¶¶ 13-18). By April 2019, the parties had reached a stalemate. The Army Corps would not award any cost adjustment for any delays, but recognized escort delays of 12 days (and delays of 22 days due to badging appointments and seven days due to severe weather) (supp. R4, tab 16 at 2-3; tab 17 at 2-3; tab 40 – Yassin decl. ¶¶ 18, 20-21).

On May 20, 2019 (after the unsuccessful negotiations and while waiting for a decision on its requests for equitable adjustment), Al Ghanim submitted a combined document styled as a request for equitable adjustment, reiterating its requests for a 41-day time extension and $412,950.85 for delays encountered at the Visitor Control Center while accessing the base between January and October 2018 (62984 R4, tab 56 at 1; 62321 R4, tab 58 at 1). Of the total costs, Al Ghanim again reiterated that it sought $206,621.96 related to work on JLOC-A and $206,328.89 related to work on JLOC-B (62984 R4, tab 56 at 1-2, 16-21, 389-94; 62321 R4, tab 58 at 1-2, 16-21, 389-94). Al Ghanim attached a document labeled as a "draft" titled "Letter Request for

Contracting Officer Final Decision ('COFD') under the Contract Disputes Act ('CDA')" which Al Ghanim "submitted so that the Government can immediately review the matter for a mutual and amicable finalization, and . . . . [i]f resolution cannot be achieved bilaterally, then consider this a 'Claim' under the Contract Disputes Act" (62984 R4, tab 56 at 2; 62321 R4, tab 58 at 2). Al Ghanim included no certification with this submission, neither as a claim under the CDA nor as a request for equitable adjustment (62984 R4, tab 56 at 2; 62321 R4, tab 58 at 2). Although seeking delay costs, Al Ghanim cited the Contract's Changes clause, which states: "If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing." Federal Acquisition Regulation (FAR) 52.243-4(d) (JUN 2007) (incorporated by reference in Contract, 62321 R4, tab 3 at 22; 62984 R4, tab 5 at 22; 62984 R4, tab 56 at 2; 62321 R4, tab 59 at 2). The Contract also includes a Suspension of Work clause that states:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

FAR 52.242-14(b) (APR 1984) (incorporated by reference in Contract, 62321 R4, tab 3 at 22; 62984 R4, tab 5 at 22).

On June 16, 2019, the Army Corps responded to Al Ghanim's November 2018 requests for equitable adjustment for "entry-related delays to site access due to security forces being late in providing necessary escorts and delays due to severe weather conditions" from January through October 2018 (62321 R4, tab 59 at 1; 62984 R4, tab 57 at 1). The contracting officer recognized that Al Ghanim had shown six days of severe weather delays and 36 days related to security escort delays (62321 R4, tab 59 at 2; 62984 R4, tab 57 at 2). The agency explained: "The Government's daily Quality Control records support [Al Ghanim's] assertions of escort delays on the days identified" (62321 R4, tab 59 at 2; 62984 R4, tab 57 at 2). The contracting officer granted Al Ghanim an "additional two days of time extension for escort delays" because the "overall impact" was likely greater than just the specific days directly impacted (62321 R4, tab 59 at 3; 62984 R4, tab 57 at 3).

6

While granting time extensions, the contracting officer refused to award any costs to Al Ghanim for the delays (62321 R4, tab 59 at 4; 62984 R4, tab 57 at 4). "The Government has made no change to the contract regarding its weather or escort requirements, and therefore no change has occurred" (62321 R4, tab 59 at 4; 62984 R4, tab 57 at 4). The contracting officer believed that "both weather and escort delays are to be considered as excusable, non-compensable delays" under the Contract (62321 R4, tab 59 at 4; 62984 R4, tab 57 at 4). The contracting officer relied on the excusable delays provision of the Contract's Default clause, which states a contractor "shall not be terminated" where the "delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor" such as "acts of the Government in either its sovereign or contractual capacity" and "unusually severe weather." FAR 52.249-10(b)(1)(ii) & (x) (APR 1984) (incorporated by reference in the Contract, 62321 R4, tab 3 at 23; 62984 R4, tab 5 at 23). The contracting officer explained, "Default-related events do not entitle [Al Ghanim] to extended site overhead costs; only the time it was impacted by the events" (62321 R4, tab 59 at 4; 62984 R4, tab 57 at 4). Thus, the contracting officer denied Al Ghanim's request for costs but agreed "to a time extension of 44 days due to excusable, non-compensable delay" (62321 R4, tab 59 at 4; 62984 R4, tab 57 at 4). While the contracting officer titled the final section of the letter as the "Final Decision," throughout the letter (including in that section) the government was responding to Al Ghanim's requests for equitable adjustment (62321 R4, tab 59 at 1, 4; 62984 R4, tab 59 at 1, 4). The contracting officer's responses to the requests for equitable adjustment did not include any notice of appeal rights as required by the CDA and FAR 33.211(a)(4)(v).

After issuing the decisions on the requests for equitable adjustment, the Army Corps unilaterally modified each task order to grant Al Ghanim "a time extension of 44 non compensable days" for weather and security escort delays (62321 R4, tab 16 at 1, 4; 62984 R4, tab 12 at 1; supp. R4, tab 20 at 1; supp. R4, tab 21 at 1). The modification extended the contract completion date to November 7, 2018 (supp. R4, tab 20 at 1; tab 21 at 1).

On August 22, 2019, the parties exchanged correspondence indicating an understanding that the requests for equitable adjustment were still open to discussion (supp. R4, tab 22). The contracting officer's representative stated, "We understand there are open REA for the JLOC projects . . . , but we need to confirm when are you submitting your final invoices" (supp. R4, tab 22 at 2). Al Ghanim responded to the contracting officer's representative and the contracting officer: "[F]or JLOC's REA, we will be submitting a reply to the KO's letter next week. Upon receiving KO's reply to our letters, we will notify you with our decision on the submission of the final payments" (id.). On September 10, 2019, the contracting officer's representative requested an update, indicating that the contracting officer had not yet received Al Ghanim's letter with the "JLOC closeout invoice" (id.). Later that day the contracting

officer stated that "REA Response Letters for JLOC A & B" were "final" and "[t]his REA is considered closed and we need it close it" [*sic*] (supp. R4, tab 22 at 1).

The next day, on September 11, 2019, Al Ghanim requested that the contracting officer issue a final decision under the CDA regarding its JLOC-A claim for delay costs of $206,621.96 (62321 R4, tab 2 at 1; supp. R4, tab 23 at 2 (email attaching the letter)). On December 30, 2019, Al Ghanim requested a final decision under the CDA regarding its JLOC-B claim for delay costs of $206,328.89 (62984 R4, tab 4 at 1, 3). Responding to the contracting officer's June 16, 2019 determination, Al Ghanim argued that there was no sovereign act that justified awarding only a time extension but not costs due to the delay (62321 R4, tab 2 at 1; 62984 R4, tab 4 at 3). Al Ghanim also noted its belief that the contracting officer's response to the request for equitable adjustment "was apparently not issued as a 'final decision'" and "[t]hus we do not believe any jurisdictional requirements had attached for Appeal purposes to the ASBCA and/or the United States Corps [*sic*] of Federal Claims" (62321 R4, tab 2 at 1; 62984 R4, tab 4 at 3). Consistent with this understanding, Al Ghanim certified its claim per the CDA as delineated by the Contract's Disputes clause (62321 R4, tab 2 at 2; 62321 R4, tab 3 at 22 (Contract incorporating by reference, FAR 52.233-1 Alt. 1, DISPUTES (DEC 1991)); 62984 R4, tab 4 at 4; 62984 R4, tab 5 at 22).

On October 9, 2019, Al Ghanim sent an email to the Army Corps Area Engineer (copying the contracting officer) that it still was "waiting" for a response from the Army Corps regarding its September 11, 2019 certified claim (supp. R4, tab 23 at 1). In response on the same day (now more than 90 days after the June 2019 request for equitable adjustment decisions), the Army Corps Area Engineer (copying the contracting officer) asserted that the June 2019 decision "WAS the final decision" and "[t]here is no other letter coming your way to respond" to the certified claim (*id.*).

On December 20, 2019, Al Ghanim noticed an appeal to this Board based on a deemed denial of its claim regarding costs relating to the JLOC-A task order, which we docketed as ASBCA No. 62321. On July 16, 2021, Al Ghanim noticed an appeal to this Board based on a deemed denial of its claim regarding costs relating to the JLOC-B task order, which we docketed as ASBCA No. 62984. We subsequently granted Al Ghanim's request to consolidate the appeals. In its complaints, Al Ghanim stated that the "underlying dispute arises out of delay claims" and the "government failure to properly sustain its own employees where the government is responsible for the delay is a 'constructive change'" (62321 compl. at 1-2; 62984 compl. ¶¶ 1, 7).

IV.    *The Costs Sought by Al Ghanim on Appeal*

Al Ghanim has reduced the amount it seeks for the delay costs because (1) it determined that several days were the result of weather conditions (for which it seeks no compensation) rather than delays in arrival of the Air Force security escorts, and (2)

it now seeks only its direct costs and no longer seeks any overhead costs (app. R11 br., ex. A.1; Lakshmi aff. ¶ 15). Al Ghanim seeks $131,174.88 in delay costs related to its work at JLOC-A (app. R11 br., ex. A.2 at 6). Al Ghanim seeks $124,056.07 in delay costs related to its work at JLOC-B (app. R11 br., ex. A.3 at 101).

To support its appeal, Al Ghanim relies on its daily quality control reports, in which it noted contemporaneously when Al Ghanim's personnel arrived at the Visitor Control Center, when the security escort arrived at the Visitor Control Center (for most days), and when Al Ghanim arrived at the work site that day (app. R11 br., exs. A.4, A.5). For each of the days of delay, Al Ghanim subtracts 30 minutes as priced into its daily costs for processing through the Visitor Control Center (app. R11 br., exs. A.2, A.3). Based on these daily records and subtracting 30 minutes of time each day, Al Ghanim claims delays of between 10 minutes and four hours on 73 days for JLOC-A and 71 days for JLOC-B (app. R11 br., exs. A.1-A.3). For each day, Al Ghanim calculated its total manpower daily rate by using the number and type of employees (as reflected in the contractor's daily quality control reports and the government's quality assurance reports), hours worked, and an average hourly rate from the labor rates for each day using the timecards of each employee that worked for Al Ghanim (app. R11 br., ex. A.2 at 7-76; ex. A.3 at 130-73; exs. C & D; exs. A.4-A.5; 62321 R4, tab 69; 62984 R4, tab 68). For each day, Al Ghanim calculated its equipment rate based on the equipment it used that day (as reflected on the contractor's quality control reports and the government's quality assurance reports) using the "actual values" for the hourly rates of the equipment identified by name and serial number (app. R11 br., ex. A.2 at 77-97; A.3 at 107-24; Lakshmi aff. ¶ 17; app. R11 br., exs. A.4-A.5; 62321 R4, tab 69; 62984 R4, tab 68). Al Ghanim stated that it owned all the equipment used (app. R11 br., ex. A.1 at 2).

The Army Corps presented evidence analyzing Al Ghanim's alleged delays (supp. R4, tab 39). The agency's cost analyst questioned the reliability and sufficiency of Al Ghanim's documentation to support its labor rates because Al Ghanim "did not provide certified payroll information" in addition to the daily timecards (supp. R4, tab 39 – Witherington decl. ¶ 27(f)). Nevertheless, the cost analyst concluded that "the number and type of direct laborers claimed in the New Documentation was mostly supported by the Working Cards, but there were a small number of discrepancies where [Al Ghanim] either slightly overreported or underreported the number of laborers" (supp. R4, tab 39 – Witherington decl. ¶ 27(g)).

The agency's cost analyst also questioned the equipment rates because Al Ghanim allegedly failed to include information regarding the "equipment's year purchased, make, model, tire type, and engine type" that would allow confirmation of "industry standard active and standby rates" (supp. R4, tab 39 – Witherington decl. ¶ 27(d)(iii)). The analyst asserted that the equipment should be billed at a standby or idle rate "because it is not actively being operated and used," during the delay, which

9

would result in a "lower hourly rate based on use and equipment depreciation," but it "appear[ed]" that Al Ghanim used its "active rate for all equipment" (supp. R4, tab 39 – Witherington decl. ¶¶ 27(d)(i) & (ii)).

Despite questioning the labor and equipment documentation, the cost analyst nevertheless used Al Ghanim's cost information in assessing the delay costs (supp. R4, tab 39 – Witherington decl. ¶¶ 25(a)-(b)). The cost analyst reviewed Al Ghanim's cost and supporting documentation and re-calculated Al Ghanim's delay costs (*id.*). First, the cost analyst determined that Al Ghanim "provided no justification . . . as to why [Al Ghanim] included additional time past the escorts' arrival" at the Visitor Control Center, so any travel time from the Visitor Control Center to the site was eliminated from his calculation of recoverable delay costs (*id.* ¶ 27(a); tabs 39g-39h). Second, the cost analyst removed any days where Al Ghanim provided no supporting documentation (such as quality control reports or approved security escort request forms) to prove when the security escorts arrived or were supposed to arrive at the site (supp. R4, tab 39 – Witherington decl. ¶¶ 25(f)(i)-(ii) & (v); tabs 39e & 39f (red and orange highlights)). Third, the cost analyst removed any days where adverse weather caused work stoppages or Al Ghanim encountered wet site conditions (supp. R4, tab 39 – Witherington decl. ¶¶ 25(f)(iii) & (iv); tabs 39e & 39f (blue and yellow highlights)).

For the remaining days, the cost analyst calculated the delays from the time when Al Ghanim arrived at the Visitor Control Center (whether on-time or late) through when the security escorts arrived at the Visitor Control Center (subtracting out 30 minutes for Al Ghanim's processing through security at the center) (supp. R4, tab 39 – Witherington decl. ¶ 29, tabs 39e-39h). The cost analyst then multiplied the delay time for each day with Al Ghanim's equipment and personnel costs for the day (supp. R4, tab 39 – Witherington decl. ¶ 29; tabs 39g & 39h). The cost analyst concluded that Al Ghanim should recover for 31.14 hours of delay and $17,940 for JLOC-A, and 26.7 hours of delay and $14,936 for JLOC-B (supp. R4, tab 39 – Witherington decl. ¶ 29; tabs 39g & 39h). In total, the cost analyst concluded that Al Ghanim would be entitled to $32,876 in compensable delays for both JLOC-A and JLOC-B (supp. R4, tab 39 – Witherington decl. ¶ 29; tabs 39g & 39h).

The government initially moved for summary judgment on its sovereign acts defense and the parties briefed the matter. The parties then requested that the entire appeal be submitted on the record under ASBCA Rule 11, including agreeing to treat the summary judgment briefing of the sovereign acts defense under the same standard of review as Rule 11 instead of the summary judgment standard of review.

DECISION

I.      *Standard of Review*

Board Rule 11 allows the parties to waive a hearing and submit an appeal on the record.  Board Rule 11(a); *Consorzio Stabile GMG S.c.ar.l.*, ASBCA No. 62753, 23-1 BCA ¶ 38,347 at 186,213.  Under Board Rule 11, we conduct a "trial on the record;" we may weigh evidence, including resolving any disputed facts in making our findings of fact and rendering our decision.  *D-STAR Eng'g Corp.*, ASBCA Nos. 62075, 62780, 25-1 BCA ¶ 38,816 at 188,819, 188,826.  We conduct a *de novo* review without deference to the contracting officer's final decisions.  *Dep't of Transp. v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1374-76 (Fed. Cir. 2023); 41 U.S.C. § 7103(e); ASBCA Rule 10(c), (d).

Al Ghanim, as the proponent of the claims, bears the burden of proof. *FlightSafety Int'l, Inc.*, ASBCA No. 62659, 23-1 BCA ¶ 38,245 at 185,709, *aff'd*, 130 F.4th 926 (Fed. Cir. 2025).  The Army Corps bears the burden of proving its affirmative defense invoking the sovereign acts doctrine.  *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008) ("The doctrine is an affirmative defense that is an inherent part of every government contract."); *Frazier Invs., Inc.*, ASBCA No. 63001, 23-1 BCA ¶ 38,313 at 186,042 ("As the proponent of any affirmative defense, the [government] bears the burden of proof.").

II.     *Jurisdiction – Al Ghanim Timely Appealed*

Neither party has challenged our jurisdiction to consider Al Ghanim's appeals but based on our review of the record we are obligated to raise the issue of timeliness *sua sponte* to assure that the Board has jurisdiction.  *White Balad Co.*, ASBCA No. 62934, 22-1 BCA ¶ 38,056 at 184,786.  We must assess whether the Army Corps' June 2019 determinations regarding Al Ghanim's requests for equitable adjustment triggered the running of the 90-day statute of limitations for bringing appeals to the Board, which is jurisdictional and may not be waived.  41 U.S.C. § 7104(a) ("A contractor, within 90 days from the date of receipt of a contracting officer's decision under section 7103 of this title, may appeal the decision to an agency board as provided in section 7105 of this title."); *Kellogg Brown & Root Servs., Inc.*, ASBCA No. 62681 *et al.*, 22-1 BCA ¶ 37,974 at 184,426 ("The 90-day limitation is jurisdictional and, thus, may not be waived.").  We conclude that Al Ghanim's appeals were timely because the agency did not treat the determinations as final and prejudicially failed to include the required appeal rights in its June 2019 determinations.

Al Ghanim labeled its November 2018 submissions as requests for equitable adjustments (62321 R4, tab 57; 62984 R4, tab 3).  However, the Federal Circuit has

instructed that labels are not dispositive as to whether a submission is a request for equitable adjustment or a claim. *Zafer Constr. Co. v. United States*, 40 F.4th 1365, 1367-68 (Fed. Cir. 2022); *Hejran Hejrat Co. v. United States Army Corps of Eng'rs*, 930 F.3d 1354, 1357 (Fed. Cir. 2019). We look to three objective criteria to assess whether a submission is a claim rather than a request for equitable adjustment: (1) the submission must meet the definition of a "claim" as defined by the Disputes clause in a contract (and FAR); (2) the submission includes a CDA certification (or some type of sworn statement that can be perfected into a CDA certification); and (3) the contractor must request a final decision from the contracting officer. *Mindseeker, Inc.*, ASBCA No. 63197, 24-1 BCA ¶ 38,666 at 187,960 (citing *Zafer Constr.*, 40 F.4th at 1367-68).

First, Al Ghanim's November 2018 submissions met the definition of a monetary "claim" under the CDA – "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain . . . arising under or relating to this contract." FAR 52.233-1(c) (incorporated by reference in the Contract, 62321 R4, tab 3 at 22; 62984 R4, tab 5 at 22); *Zafer Constr.*, 40 F.4th at 1367 (recognizing that the FAR definition of a claim governs the use of the term under the CDA).

Second, the November 2018 submissions included a certification per the Contract's Requests for Equitable Adjustment clause (not under the CDA) (62321 R4, tab 57 at 2; 62984 R4, tab 3 at 2). DFARS 252.243-7002 (incorporated by reference in Contract, 62321 R4, tab 3 at 23; 62984 R4, tab 5 at 23 (same)). That is some evidence that Al Ghanim meant the submissions to be requests for equitable adjustment, but it is not dispositive to whether the document constituted a certified claim because any defective certification can be perfected into a CDA certification by statute. *BAE Sys. Ordnance Sys., Inc.*, ASBCA No. 62416, 21-1 BCA ¶ 37,800 at 183,578 (noting "that the use of the REA certification [does] not prevent a submission from being a valid claim since the REA certification, notwithstanding its limitations, could be considered a defective, but curable CDA certification"); 41 U.S.C. § 7103(b)(3) ("A defect in the certification of a claim does not deprive a court or an agency board of jurisdiction over the claim.").

Third, Al Ghanim requested a final decision from the contracting officer. During the parties' negotiations they treated the submission as a request for equitable adjustment (supp. R4, tabs 16, 17; tab 40 – Yassin decl. ¶¶ 13-18). However, after negotiations broke down, Al Ghanim's May 2019 submission included a "draft" document titled "Letter Request for Contracting Officer Final Decision ('COFD') under the Contract Disputes Act ('CDA')" and requesting "that the Government can immediately review the matter for a mutual and amicable finalization, and . . . . [i]f resolution cannot be achieved bilaterally, then consider this a 'Claim' under the Contract Disputes Act" (62984 R4, tab 56 at 2; 62321 R4, tab 58 at 2). Thus, Al

12

Ghanim's May 2019 submission (although lacking any certification) met the third requirement for a claim: making a request for a final decision from the contracting officer and we hold that, at that point, the requests for equitable adjustment were definitively a CDA claim.

Given the circumstances above, the contracting officer's June 2019 determinations could be considered final decisions under the CDA, triggering the 90-day statute of limitations for filing an appeal before the Board. Here, nevertheless, Al Ghanim reasonably believed that there was no final decision on a claim for it to appeal, and in such circumstances, the appeal clock does not run. *See Guardian Angels Medical Service Dogs, Inc. v. United States*, 809 F.3d 1244, 1250-51 (Fed. Cir. 2016). As discussed above, the June 16, 2019 responses from the contracting officer constituted final decisions on the requests for equitable adjustments that we have found to meet the definition of "claims." But they were followed immediately by discussion between the Army Corps and Al Ghanim revisiting the issues in the requests for equitable adjustment and treating them as "open" (supp. R4, tab 22 at 2). Such discussions after the issuance of a final decision "serve to vacate the earlier decision along with the accompanying appeal period," because they demonstrate that the decision is non-final. *Guardian Angels*, 809 F.3d at 1250 (quoting *Royal Int'l Builders Co.*, ASBCA No. 42637, 92-1 BCA ¶ 24,684 at 123,135 (emphasis omitted)); *BR Grp.*, ASBCA No. 63507, 24-1 BCA ¶ 38,699 at 188,158 (finding an appeal timely where agency indicated reconsideration of the final decision "was at least a possibility"). Thus, the government's participation in additional talks make the June 16, 2019 decisions non-final (and the indicia of non-finality is strengthened by the contracting officer's failure to include the statutorily-required notice of appeal rights in the June 16 decisions, as discussed below).

Moreover, the contracting officer's email on September 10, 2019 – stating that the June decisions were "final," and that "this REA is considered closed and we need to close it" – did not reset the final decision date back to June 16, 2019 (supp. R4, tab 22 at 1). The Army Corps' "after-the-fact" characterizations do not change the effects of its prior actions, which kept the requests for equitable adjustment open. *Guardian Angels*, 809 F.3d at 1250.

Nor did the September 10, 2019 email reset the appellate clock. Even if we considered the September 10, 2019 email to nominally meet the criteria for a new final decision on a "claim," the Army Corps' failure to include the statutorily-required appeal rights prevented the appeal clock from running, because of actual prejudice to Al Ghanim. In particular, the CDA requires that the contracting officer "issue a decision in writing," provide it by mail or otherwise to the contractor, 41 U.S.C. § 7103(d), and "state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter." 41 U.S.C. 7103(e); FAR 33.211(a)(4)(v); *Mindseeker*, 24-1 BCA ¶ 38,666 at 187,963 ("The CDA requires that

13

a contracting officer's final decision must provide a contractor with notice of its right to appeal to a board or file suit at the U.S. Court of Federal Claims."). The contracting officer's email on September 10, though furnished to Al Ghanim, provided no explanation of its basis, whatsoever. Nevertheless, it referred to the June letters responding to the requests for equitable adjustment and arguably adopted the reasoning of the June letters. Thus, apart from its failure to include the appeal rights notice, we could find the email to meet the bare bones requirements of a contracting officer's final decision.

With respect to the advisement of rights, the CDA established the appeal rights notice requirement for the "protection of the contractor," but a contractor still must show detrimental reliance on the government's failure to provide the notice of appeal right to excuse an untimely appeal. *Decker & Co. v. West*, 76 F.3d 1573, 1579 (Fed. Cir. 1996); *see also Fla. Dep't of Ins. v. United States*, 81 F.3d 1093, 1098 (Fed. Cir. 1996). Detrimental reliance is when the contracting officer's "decision, by words of commission or omission, actually misled the contractor to its prejudice regarding its appellate rights." *Access Personnel Servs., Inc.*, ASBCA No. 59900, 16-1 BCA ¶ 36,407 at 177,518. "[N]either *Decker* nor the CDA imposes an affirmative obligation on a contractor to ascertain its appeal rights. The CDA places the obligation of notification squarely on the shoulders of the government." *Id.* "[W]here there is a failure to properly advise the contractor of its appeal rights that failing may prevent the 'appeal clock' from running." *JAAAT Tech. Servs., LLC*, ASBCA No. 61792 *et al.*, 21-1 BCA ¶ 37,878 at 183,951.

Here, Al Ghanim has demonstrated detrimental reliance based on the government's failure to provide notification of the appeal rights. Critically, both parties treated the contracting officer's June 16, 2019 letters as merely addressing what both parties saw as requests for equitable adjustments that had not ripened to claims. This is why, the day after being informed by the contracting officer that the requests for equitable adjustment were considered closed, Al Ghanim submitted a certified claim to the contracting officer. This would not have happened if either set of documents that could be read as final decisions (the June 16 letters and the September 10 emails) had included the notice of appeal rights which had made clear that the time for negotiating with the Army Corps was over. Indeed, Al Ghanim's October 9 email inquiry to the Army Corps' Area Engineer (copying the contracting officer) about the status of the claim demonstrated that it was unaware that the decisions were final and that its last recourse was to appeal the decision. Accordingly, in the context presented here, we find it more likely than not that Al Ghanim would have perfected its appeal in a timely manner if the government had included the mandatory appellate rights notification in its June, September, or October communications. Al Ghanim was prejudiced by the government's failure to provide the appeal rights in any final decisions. Thus, its appeals are timely.

III.     *The Government Has Not Proved the Sovereign Acts Defense*

"The sovereign acts doctrine provides that 'the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.'" *Conner Bros.*, 550 F.3d at 1371 (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925)). When the government contracts with a private party, the sovereign acts doctrine balances the government's "rights and duties" as governed by the "law applicable to contracts between private individuals" with the government's "need for freedom to legislate" or regulate. *United States v. Winstar Corp.*, 518 U.S. 839, 895-96 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)).[3]

To invoke the sovereign acts doctrine as an affirmative defense, the government must prove two things:  (1) a public and general government act; and (2) commercial impracticability or impossibility of performance by the government resulting from that act. *Winstar*, 518 U.S. at 891-910; *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 520-22 (Fed. Cir. 2011) (quoting, *inter alia*, *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574 (Fed. Cir. 1997) for the proposition that "the United States . . . as a contractor cannot be held liable for an obstruction of performance of the particular contract resulting from its public and general acts as a sovereign"); *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1366 (Fed. Cir. 2009); *Chugach Fed. Solutions, Inc.*, ASBCA No. 62712 *et al.*, 24-1 BCA ¶ 38,681 at 188,046-47.

The Army Corps asserts that its security escort procedures constituted a sovereign act, which bars Al Ghanim from receiving monetary relief and limited Al Ghanim's relief to the non-monetary time extensions that the agency already unilaterally provided to Al Ghanim (gov't R11 br. at 15-19; gov't SJ mot. at 1-2, 9-10; gov't SJ reply at 1-2). Al Ghanim asserts that the Army Corps has failed to prove impossibility to establish the sovereign acts defense (app. R11 br. at 8-9; app. SJ opp'n at 12-13). The Army Corps counters that it need not prove impossibility because Al Ghanim asserts only delays and not a total material breach of the contract (gov't SJ mot. at 9-10; gov't SJ reply at 6-7; gov't R11 br. at 16-17). The government's motion does not clearly state whether the Air Force's Security Instruction 32-1002 or the Air Force's implementation of that escort requirement constitutes the public and general act entitled to the Sovereign Acts defense. Regardless of the interpretation, we reject the agency's assertion and conclude that the sovereign acts defense does not apply.

---

[3] Although Justice Souter's *Winstar* decision commanded only the support of a plurality of justices, the Federal Circuit "has treated that opinion as setting forth the core principles underlying the sovereign acts doctrine." *Conner Bros.*, 550 F.3d at 1374.

A. *The Requirement to Have Security Escorts was a Public & General Government Act But Does Not Satisfy The Impossibility Requirement*

The Army Corps asserts that the requirement to have security escorts constituted a public and general act (gov't SJ mot. at 9-15; gov't R11 br. at 15-17). The agency relies on an order from the Commander of the Ninth Air Force requiring security escorts as the public and general act (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002); tab 36 – Lantz decl. ¶ 4). Al Ghanim does not dispute that this order applied during the term of this Contract when the government required Al Ghanim to request and receive approval for security escorts.

1. *The Order – Air Force Central Instruction 32-1002 – Was A Public And General Act*

We must determine whether the act was a "genuinely public and general act that only incidentally falls upon the contract" or was "simply one designed to relieve the Government of its contract duties[.]" *Klamath*, 635 F.3d at 521 (quoting *Stockton*, 583 F.3d at 1366); *see also Winstar*, 518 U.S. at 895-96 (assessing whether the act is "attributable to the Government as contractor" or sovereign). To assess the public and general nature of an act, we look at whether (1) the government's act was specifically directed at nullifying contract rights or relieving the government of its contractual obligations, and (2) the impact on public contracts (whether direct or indirect) is incidental to a broader governmental objective. *Winstar*, 518 U.S. at 898; *Conner Bros.*, 550 F.3d at 1374-75.

First, the Commander's order requiring security escorts on bases in the Ninth Air Force area of responsibility was neither directed at nullifying contract rights nor aborting contractual performance. *Conner Bros.*, 550 F.3d at 1374; *see also Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1364-65 (Fed. Cir. 2016). The Commander's order required escorts to prevent "sabotage or disclosure to enemy forces" (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002)). This was a relevant national security concern, and the instruction was an order issued by a military commander, not a contracting official. *Conner Bros.*, 550 F.3d at 1378-79 (discussing *Wilson v. United States*, 11 Ct. Cl. 513 (1875)). The government gained no economic advantage vis-a-vis the contract by requiring the use of security escorts. *See Conner Bros.*, 550 F.3d at 1375.

Second, the Commander's order requiring escorts impacted Al Ghanim's contract and other public contracts only incidentally to a broader governmental objective. *Winstar*, 518 U.S. at 898. On the one hand, the order stated its intent was to require escorts for all local national, other country national, and contract employees (supp. R4, tab 24 at 3 (Air Force Central Instruction 32-1002)). However, the order clarified that it applied to personnel "performing contracted services" that were local

16

nationals or other country nationals (*id.*). Despite the order's impact on Al Ghanim and all other service contractors at the installations it covered, it is still permissible "as long as the effect on the contractor's contract rights is incidental to a broader government objective," which it is. *Conner Bros.*, 550 F.3d at 1376.

### 2. *The Order Did Not Render Performance Impossible or Commercially Impracticable*

While the Army Corps has demonstrated the order requiring security escorts constituted a public and general act, the Army Corps must still prove impossibility or impracticability of performance. *ANHAM FZCO, LLC*, ASBCA No. 59283, 17-1 BCA ¶ 36,817 at 179,442 ("The government is excused from performance under the sovereign acts defense only when the sovereign act renders the government's performance impossible."). The Army Corps asserts that it need not prove impossibility because this "is not a regulatory amendment sovereign act case" where there is a total material breach like *Winstar* (gov't SJ mot. at 9-10; gov't SJ reply at 6-7; gov't R11 br. at 16-17). Not so. The government must still prove impossibility or commercial impracticability to rely on the sovereign acts defense to relieve it of monetary liability.

The Army Corps asserts that it need not prove impossibility pointing to two decisions where we did not discuss impossibility in our sovereign acts analysis: (1) *Garco Constr., Inc.*, ASBCA Nos. 57796, 57888, 14-1 BCA ¶ 35,512 at 174,072-74; *Garco Constr., Inc.,* ASBCA Nos. 57796, 57888, 15-1 BCA ¶ 36,135 at 176,378, *aff'd*, 856 F.3d 938 (Fed. Cir. 2017); and (2) *Nassar Grp. Int'l N.G.I. S.A.L. (Offshore) R.C.*, ASBCA No. 58451 *et al.*, 22-1 BCA ¶ 38,206 at 185,546-47. In *Garco*, however, the contractor "failed to argue that the government did not satisfy the 'impossibility' requirement of the sovereign act defense," and waived that argument. *Garco*, 856 F.3d at 942 n.2 (quoting *Conner Bros.*, 550 F.3d at 1379). Here, Al Ghanim has raised impossibility. In *Nassar*, the contractor attempted to assert impossibility of performance as an affirmative claim, so the contractor had no reason to challenge the government on this point. *See Nassar Grp. Int'l*, ASBCA No. 58451 *et al.*, 19-1 BCA ¶ 37,405 at 181,831.

As we have recently reiterated, the caselaw "absolutely requires application of the impossibility test as a component of the sovereign acts defense." *Chugach*, 24-1 BCA ¶ 38,681 at 188,047. And, it would be reversible error if we failed to assess impossibility, once raised. *Klamath*, 635 F.3d at 522 (vacating trial decision for failing to assess impossibility in sovereign acts defense). We have regularly found that the government must prove impossibility or commercial impracticability when invoking the sovereign acts defense, even where the contractor seeks equitable adjustments based on delays, changes, or other remedy-granting clauses under a contract rather than alleging a total material breach. *Chugach*, 24-1 BCA ¶ 38,681

17

at 188,045 (Changes clause and agency specific health and safety clause); *GEMS Env't Mgmt. Servs.*, ASBCA No. 61737 *et al.*, 24-1 BCA ¶ 38,621 at 187,745-46 (delay claim where government demonstrated impossibility); *McCarthy HITT – Next NGA West JV*, ASBCA Nos. 63571, 24-1 BCA ¶ 38,483 at 187,041-42 (declining to dismiss constructive change, suspension of work, and implied covenant for good faith and fair dealing claims based on the sovereign acts doctrine, because it was not clear "that the government will be able to establish the second element, impossibility"); *StructSure Projects, Inc.*, ASBCA No. 62927, 23-1 BCA ¶ 38,416 at 186,680 (Changes clause), *aff'd*, No. 2024-1251, 2025 WL 2860720 (Fed. Cir. Oct. 9, 2025); *APTIM Fed. Servs., LLC*, ASBCA No. 62982, 22-1 BCA ¶ 38,127 at 185,219 (Changes clause). Thus, impossibility applies regardless of whether the contractor relies on a remedy granting clause under the contract or asserts a breach claim relating to the contract.

To establish impossibility, the government must prove (1) a supervening event that made performance impossible or commercially impracticable, (2) the contract assumed the non-occurrence of the supervening event, (3) the government as contractor,[4] was not at fault for the occurrence of the supervening event, and (4) the government did not assume the risk of the occurrence. *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002); *see also Winstar*, 518 U.S. at 904-10; *Chugach*, 24-1 BCA ¶ 38,681 at 188,047. Although the Board sometimes decides impossibility based on a single, dispositive element, we review each element.

First – and the government has no defense for this – no supervening event made performance impossible or commercially impracticable. *Seaboard*, 308 F.3d at 1294-95. A supervening event occurs *after* the parties enter into a contract. *Shubhada Indus., Inc.*, ASBCA No. 54016, 08-1 BCA ¶ 33,733 at 167,019 (noting a party "must show that a supervening event, after it entered into the contract, made performance impracticable"); RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981) (supervening impracticability happens "after a contract is made"). Here, the requirement for security escorts existed before the parties entered the Contract and there was no supervening event.

Second, the Contract did not assume the non-occurrence of the requirement that Al Ghanim obtain security escorts. *Seaboard*, 308 F.3d at 1294-95; RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. b (1981). To the contrary, the Contract

---

[4] In applying this four-part impossibility test from *Seaboard Lumber* to the sovereign acts defense, we have previously referenced "the government" in this element, rather than "the government as contractor." *See, e.g., Chugach*, 24-1 BCA ¶ 38,681 at 188,047 (citing *APTIM*, 22-1 BCA ¶ 38,127 at 185,219). Notwithstanding that slight omission in the past, in applying impossibility to the sovereign acts defense requires such a differentiation, about which we have been very clear. *See APTIM*, 22-1 BCA ¶ 38,127 at 185,219.

incorporated the requirement that Al Ghanim obtain security escorts and the standard Suspension of Work clause (62321 R4, tab 3 at 22, 53-54; 62984 R4, tab 5 at 22, 53-54).

Third, the government as contractor is at fault for the delays caused by the required security escorts. *Seaboard*, 308 F.3d at 1294-95. Although not the only way to assess fault, we have sometimes analyzed this factor by looking at whether the government issued instructions or orders implementing the public and general act (which is how the Army Corps frames it). *ANHAM FZCO*, ASBCA No. 58999, 20-1 BCA ¶ 37,745 at 183,189; *Home Ent., Inc.*, ASBCA No. 50791, 99-2 BCA ¶ 30,550 at 150,861. The Army Corps asserts that it was not responsible for any delays because the contracting officer did not issue instructions or orders implementing the security escorts requirement, but instead the Contract deferred to a different government agency – the Air Force – to schedule and conduct the security escorts, not the contracting officer (gov't SJ reply at 11-14; gov't R11 br. at 17-18). Indeed, the Contract states that the Air Force would provide security escorts and, during performance, Al Ghanim submitted request forms to the Air Force for approval of dates and times of escorts (62321 R4, tab 3 at 56; 62984 R4, tab 5 at 56; app. R11 br., ex. F at 147; supp. R4, tab 30). Yet, "[w]hen the sovereign can implement its policy without violating the contractual rights of the parties, the Government is liable for the resulting damages." *Home Ent.*, 99-2 BCA ¶ 30,550 at 150,861; *see also Borderland Spraying Serv.*, AGBCA No. 90-180-1, 93-3 BCA ¶ 26,214 at 130,463 (stating that "the Government may be liable for its sovereign acts if it does not implement them in the least restrictive or least costly manner"). Here, the government would not have been liable to Al Ghanim for rejecting the requests due to a lack of availability, but once Al Ghanim complied with all the procedures associated with the security escort policy and the Air Force approved a request (with specific date and time) the government bears liability for the resulting delays.

Fourth, we look at whether the government assumed the risk of the supervening occurrence of delay resulting from the security escort requirement. *Seaboard*, 308 F.3d at 1294-95; *see also Piszel v. United States*, 833 F.3d 1366, 1380-81 (Fed. Cir. 2016). We have sometimes (but not always) characterized this assumption of risk as whether "the government expressly or impliedly agrees to pay the contractor's losses due to the sovereign acts" (which is the way that the Army Corps frames this issue). *ANHAM*, 20-1 BCA ¶ 37,745 at 183,189; *see also Amino Bros. Co. v. United States*, 372 F.2d 485, 525 (Ct. Cl. 1967) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act."); *Altanmia Com. Mktg.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095 at 168,582 ("[I]t is settled that the government may contractually agree to compensate contractors for losses due to its sovereign acts, either by an implied or an express agreement."). Where the risk is "foreseeable there should have been a

provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." *Seaboard*, 308 F.3d at 1295 (quoting *Winstar*, 518 U.S. at 905 (internal quotation omitted)).

Here, even assuming there was a supervening event, the Contract placed the risk on the government for delays in the arrival of approved security escorts. The Army Corps alleges five contractual provisions placed the risk of government delay on Al Ghanim, not the agency: (1) the security requirements would "take precedence over the accomplishment of the work under this contract" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54); (2) the government's "capacity . . . to provide Escorts is limited, and subject to unavoidable shortages" (*id.*); (3) adjustments of work schedules would be subject to the "Government's ability to provide Escorts" (*id.*); (4) the escort request forms stated that "an escort request does not guarantee availability" (supp. R4, tab 30); and (5) the requirement for Al Ghanim to price in the cost of "complying with escort policies" (62321 R4, tab 3 at 40, 54; 62984 R4, tab 5 at 40, 54; gov't SJ reply at 14-16; gov't R11 br. at 18-19, 22). While these provisions served to warn Al Ghanim that the government could not guarantee escorts based on submitting escort request forms and that Al Ghanim bore the costs of complying with the process of requesting security escorts, it says nothing about which party should bear the costs of unreasonable delay once the government approved an escort and represented to Al Ghanim that it would be provided. By approving the escort for a specific day and time, the government affirmatively determined its ability to provide escorts (notwithstanding shortages and that security would take precedence over completion of the work). Al Ghanim may seek recovery for delays once it received approval for escorts on a particular day and time based on the standard risk shifting provisions regarding delays in the Contract. *Winstar*, 518 U.S. at 908-09 (stating that government contract "provisions shifting financial responsibility to the Government for events which might occur in the future" that "may be triggered by sovereign government action does not render the relevant contractual provisions any less binding" (quoting *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958-59 (Fed. Cir. 1993)).

B.     *The Government's Implementation Of The Security Escort Provisions Were Not Public And General Acts*

The Army Corps' argument can also be read as alleging that the public and general acts were the Air Force's implementation of the security escort requirement, which required Air Force approval of the day-to-day "escort actions" (gov't SJ mot. at 10-11; gov't R11 br. at 16). However, the day-to-day escort actions were required and implemented by the Contract, including requiring notification and other procedures to the Army Corps' contracting officials; and the Air Force's approval of each security escort necessarily related to an individual contractor – Al Ghanim (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54; app. R11 br., ex. F).

20

Specifically, the Contract required Al Ghanim to provide the contracting officer with twice-weekly reports of Al Ghanim's expected manpower to give the contracting officer accurate estimates to plan how many security escorts would be necessary (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54). By noon each day, Al Ghanim had to provide the contracting officer with the next day's personnel and crew size, and required Al Ghanim to "confirm that the required escorts will be available" (62321 R4, tab 3 at 54; 62984 R4, tab 5 at 54). The Army Corps' project manager also "actively monitored" the force protection process to avoid or mitigate delays (supp. R4, tab 35 – Heffern decl. ¶¶ 13-15). Thus, the Army Corps' contracting officer and personnel still managed some of the contractual requirements for security escorts.

Moreover, usually enlisted personnel at the installation security office approved the day-to-day escort actions, which seems a far cry from an individual "clothed with the kind of executive power and authority to impose genuinely public and general requirements for the government of a sovereign character." *HECO Pac. Mfg., Inc.*, ASBCA No. 63217, 25-1 BCA ¶ 38,902 at 189,376; (app. R11 br., ex. F). We hold that the approval of the day-to-day security escort requests were not public and general acts. Because we do not find the implementation to be public and general acts, we do not reach the question of impossibility on this point. Other than Air Force Central Instruction 32-1002, the Army Corps has pointed to no other public and general act issued or performed by a comparable authority.

IV.   *Al Ghanim Has Proved Some Compensable Delays*

Al Ghanim seeks its direct costs for the government's security escort delays.[5] The Army Corps challenges Al Ghanim's proof of its damages. Al Ghanim sometimes frames its claim as seeking "delay costs" for a "constructive change" under the Contract per the Changes clause (62321 compl. at 1-2; 62984 compl. ¶¶ 1, 7; app. R11 reply br. at 13). However, we typically will not resort to the Changes clause for delay claims unless the contract lacks a Suspension of Work clause. *Coley Properties Corp. v. United States*, 593 F.2d 380, 385-86 (Ct. Cl. 1979) (seeking delay costs under the

---

[5] Al Ghanim's briefs occasionally state that it is still seeking "overhead," but the costs it submitted and defends as part of its Rule 11 briefing seek only direct costs, not indirect costs (app. R11 br. at 2, 3, 6; app. R11 reply br. at 6). In any event, Al Ghanim neither provided any arguments or evidence supporting recovery of overhead costs nor, for example, applied the *Eichleay* formula for home office overhead. *See Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1374-75 (Fed. Cir. 1999) ("The *Eichleay* formula is the only means approved in our case law for calculating recovery for unabsorbed home office overhead." (discussing *Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688)). Nor did Al Ghanim attempt to rebut the Army Corps' overhead arguments in Al Ghanim's reply brief. Whether Al Ghanim still seeks these costs, it has failed to prove them.

Changes clause in lease that did not have Suspension of Work clause); *Webb Elec. Co. of Fl., Inc.*, ASBCA No. 54293, 07-2 BCA ¶ 33,717 at 166,939 ("[A]ny recovery by appellant is by way of an adjustment under the Suspension of Work clause, and not an equitable adjustment under the Changes clause."), *aff'd*, 299 F. App'x 958 (Fed. Cir. 2008); JOHN CIBINIC, JR. *ET AL.*, ADMINISTRATION OF GOVERNMENT CONTRACTS 548 (5th ed. 2016) (noting that recovery for delays under the Changes clause "has usually occurred in situations where the contract contains no Suspension of Work clause"). Here, the Contract includes a Suspension of Work clause. *See* FAR 52.242-14(b) (incorporated by reference in Contract, 62321 R4, tab 3 at 22; 62984 R4, tab 5 at 22). Thus, Al Ghanim more appropriately may seek to recover its delay costs as a constructive suspension under the Suspension of Work clause.

"Constructive suspension occurs when work is stopped absent an express order by the contracting officer and the government is found to be responsible for the work stoppage." *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359 (Fed. Cir. 2002). A contractor may recover for constructive suspensions if it establishes the government caused a "suspension, delay, or interruption [of performance]" for "an unreasonable period of time" that was not due to "any other cause, including the fault or negligence of the Contractor[,]" and resulted in "any increase in the cost of performance[.]" FAR 52.242-14(b); *Triax-Pac., JV v. Stone*, 958 F.2d 351, 353-54 (Fed. Cir. 1992). "What is a reasonable period of time for the government to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." *Tri-Cor, Inc. v. United States*, 458 F.2d 112, 131 (Ct. Cl. 1972). "An initial portion of the delay can be reasonable followed by an additional period that is unreasonable." *GSI Constr. Corp.*, ASBCA No. 63828, 25-1 BCA ¶ 38,851 at 189,050.

The Army Corps challenges Al Ghanim's delay claims asserting: (1) none of Al Ghanim's costs were reasonable because the Contract shifted all risk for security escort delays to the contractor; (2) even if Al Ghanim can recover, it has failed to provide sufficient cost documentation to support its direct costs; and (3) Al Ghanim has failed to prove that the government caused most of the claimed damages. We review the agency's objections in turn.

A.    *Al Ghanim Did Not Assume the Risk of Security Escort Delays*

Refashioning what it argued regarding the sovereign acts defense, the Army Corps asserts that there could be no unreasonable delay because the Contract placed all the risk of delay on Al Ghanim and not the government (gov't R11 br. at 21-23). The Army Corps again points to the Contract's provisions that required Al Ghanim to price in the "cost implications inherent in [the] accomplishment of work on secure installations" and "complying with escort policies;" and the warnings that shortages did not guarantee that the Air Force would approve escort requests (62321 R4, tab 3 at 40, 54; 62984 R4, tab 5 at 40, 54). The government again contends that this

22

contractual language shifted the risk to Al Ghanim for all compensable delays, relying on *Phylway Constr., LLC*, ASBCA No. 62961, 22-1 BCA ¶ 38,218, and *M.A. Santander Constr., Inc.*, ASBCA No. 15882, 76-1 BCA ¶ 11,798.

Notwithstanding the agency's contention, the Contract included no provision triggering suspension of performance like in *Phylway*, 22-1 BCA ¶ 38,218 at 185,620-21 (contract provision required suspension of performance anytime flood waters rose above a certain level).  Instead, the Contract just included a general warning that there may be escort shortages and, because of that, Al Ghanim needed to comply with the policies of notifying the contracting officer at noon prior to each workday regarding availability of escorts, and requesting and receiving approval for escorts on a particular day and time, which Al Ghanim did (62321 R4, tab 3 at 40, 54; 62984 R4, tab 5 at 40, 54).  In *M.A. Santander*, the contractor sought its costs for complying with a contract's security requirements, but Al Ghanim does not seek its costs for complying with obtaining security escorts (or the Contract's other security requirements) or for the days the government could not provide escorts, but for unreasonable delays by the government after Al Ghanim complied with the Contract's security requirements. *M.A. Santander*, 76-1 BCA ¶ 11,798 at 56,324-25.  Nor does Al Ghanim seek the costs of any delays caused by the Air Force's denial of any of Al Ghanim's security escort requests.  Only approved security escort requests are at issue in these appeals.  Thus, as we concluded above, Al Ghanim's compliance with those policies shifted the risk of unreasonable delays to the government.

B.     *Al Ghanim Provided Sufficient, Reliable Documentation to Evaluate its Labor and Equipment Costs*

The Army Corps challenges Al Ghanim's cost documentation as insufficient (gov't R11 br. at 28-29).  The Contract includes the Pricing of Contract Modifications clause which states, "When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31 and DFARS part 231, in effect on the date of this contract, apply."  DFARS 252.243-7001 (DEC 1991) (incorporated by reference in Contract, 62321 R4, tab 3 at 23; 62984 R4, tab 5 at 23); *Superstaff, Inc.*, ASBCA No. 48062 *et al.*, 97-1 BCA ¶ 28,845 at 143,887 (concluding that the Pricing of Contract Modifications clause made "standard cost principles" under FAR Part 31 applicable to assessing equitable adjustment costs (internal citations omitted)).  Generally, under the FAR's cost principles, a contractor must provide "supporting documentation, adequate to demonstrate that costs claimed have been incurred[.]" *Int'l Dev. Solutions, LLC v. Sec'y of State*, 105 F.4th 1375, 1380 (Fed. Cir. 2024) (quoting FAR 31.201-2(d) (emphasis omitted)).

The agency asserts Al Ghanim's manpower or labor cost documentation is insufficiently reliable because the contractor has not provided certified payroll records for manpower costs and there were discrepancies in Al Ghanim's analysis and its

timecards (gov't R11 br. at 28-29). Al Ghanim relies on its daily timecards to show which personnel worked on a given day and the hourly rate for each worker that day to determine the daily manpower rate (app. R11 br., ex. A.2 at 7-76; ex. A.3 at 130-73; exs. C & D). Also, Al Ghanim listed the labor classification and hours worked on its quality control reports and the Army Corps' daily quality assurance reports listed contractor personnel by labor classification (and sometimes by name) (app. R11 br., exs. A.4-A.5; 62321 R4, tab 69; 62984 R4, tab 68). This documentation is sufficiently reliable to prove Al Ghanim incurred these direct labor delay costs. *D-STAR*, 25-1 BCA ¶ 38,816 at 188,834; *Derian, Inc.*, ASBCA No. 62957, 23-1 BCA ¶ 38,425 at 186,753 (permitting recovery where the contractor could only provide monthly timecards without describing "the type of work performed or any proof of payment"). Indeed, the agency's cost analyst concluded that Al Ghanim's direct labor analysis "was mostly supported by the Working Cards, but there were a small number of discrepancies where [Al Ghanim] either slightly overreported or underreported the number of laborers" (supp. R4, tab 39 – Witherington decl. ¶ 27g). Thus, this data is sufficiently reliable to serve as a basis to assess Al Ghanim's claimed delay costs.[6]

The agency also asserts Al Ghanim (1) has failed to include cost documentation supporting its equipment rates and (2) has apparently used the active rates for the equipment rather than inactive or idle rates as allegedly required during a suspension of work (gov't R11 br. at 28-29). First, Al Ghanim provided a serial number and description of each piece of equipment used for each day it claimed a delay, which it took from its daily quality control reports (app. R11 br., ex. A.2 at 77-97; A.3 at 107-24; exs. A.4-A.5 (daily quality control reports listing equipment on-site)). The Army Corps' daily quality assurance reports also listed the equipment on-site each day (62321 R4, tab 69; 62984 R4, tab 68). We conclude that this documentation suffices to prove Al Ghanim's equipment costs.

Second, the Army Corps' cost analyst speculates that Al Ghanim is relying on its active rates and asserts that the equipment costs should be reduced for being idle during a suspension of work, citing *J.D. Shotwell Co.*, ASBCA No. 8961, 65-2 BCA ¶ 5243 at 24,689 (gov't R11 br. at 29; supp. R4, tab 39 – Witherington decl. ¶¶ 27(d)(i) &(ii)). However, *J.D. Shotwell* and its progeny have reduced recovery of equipment costs for idleness when the contractor was unable to provide actual costs of

---

[6] The Army Corps' cost analyst speculates that Al Ghanim only had one crew on site, not two separate crews working on JLOC-A and JLOC-B (supp. R4, tab 39 – Witherington decl. ¶ 27(h)). However, the cost analyst does not provide an analysis beyond one spot example and concedes that it was "impossible to confirm" his speculation (*id.*). That is not enough. And, the Board has no obligation to "scour the record" to prove a party's speculative arguments. *Parsons Evergreene, LLC v. Sec'y of Air Force*, 968 F.3d 1359, 1368 (Fed. Cir. 2020); *Nassar*, 22-1 BCA ¶ 38,206 at 185,551.

24

the equipment and, instead, had to rely on predetermined rate schedules that were reduced to approximate actual cost rates that would be lower due to depreciation and wear and tear. *J.D. Shotwell*, 65-2 BCA ¶ 5243 at 24,689 (using predetermined rates); *see also L.L. Hall Constr. Co. v. United States*, 379 F.2d 559, 568 (Ct. Cl. 1966) (noting that "for contractor-owned equipment, lacking actual cost records for the delay period," the court used "the acquisition cost of each piece of equipment involved applied to the formula set forth in the [Associated General Contractors of America, Inc.] ownership expense manual and reduced by 50 percent for idle time"). Those decisions follow the treatment of predetermined costs under the FAR (and the Armed Services Procurement Regulation (ASPR) in effect when those decisions were issued), but not actual rates. FAR 31.105(d)(2)(i)(C) (discussing in the context of predetermined use rates that "[i]n periods of suspension of work pursuant to a contract clause, the allowance for equipment ownership shall not exceed an amount for standby cost as determined by the schedule or contract provision"); ASPR 15-402.1(c) (1963) (similar predecessor provision, but specifically requiring recovery of no more than "50 percent" of the predetermined rate).

Al Ghanim has provided its actual costs each day (app. R11 br., ex. A.1 at 2; ex. A.2 at 3-6; A.3 at 98-101). Actual rates are preferred when assessing equipment costs and there is no similar requirement for reducing actual rates while on standby. FAR 31.105(d)(2)(i)(A) ("Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records."); *U.A. Anderson Constr. Co.*, ASBCA No. 53452, 02-1 BCA ¶ 31,715 at 156,702 (noting that the "FAR thus makes mandatory the use of actual cost data from a contractor's accounting records"); *see also Metric Constr. Co. v. United States*, 81 Fed. Cl. 804, 828 (2008) ("[T]he DFARS and FAR Part 31 call for a hierarchy of means of deriving ownership and operating costs for construction equipment, starting with actual-cost data and progressing to 'predetermined schedules' as agreed in particular instances."); *C. Mourer Constr., Inc. v. United States*, 23 Cl. Ct. 533, 540 (1991) ("The court rejects defendant's contention that the Corps may limit recovery to actual costs and to the predetermined schedules. If a contractor possesses accounting records sufficient to document its actual costs, such records must form the basis for determining equipment costs."). Thus, Al Ghanim's actual equipment costs are appropriate for use here.

C.    *Al Ghanim Has Proved the Army Corps Caused Some, But Not Most of its Delay Costs*

Al Ghanim asserts that it should receive the costs of delay from the time Al Ghanim's personnel arrived at the Visitor Control Center until Al Ghanim and government security escorts arrived at the project sites, subtracting 30 minutes of time for Al Ghanim's processing through the Visitor Control Center (app. R11 br., ex. A.2

25

at 3-6, ex. A.3 at 98-101; app. R11 reply br. at 7). Above we found the 30-minute time period to be reasonable (supp. R4, tab 40 – Yassin decl. ¶ 11; app. R11 br., Lakshmi aff. ¶¶ 9, 15; 62321 R4, tab 3 at 9-11; 62984 R4, tab 5 at 9-11). The Army Corps challenges whether all the delays were caused by the government (gov't R11 br. at 23-28).

"Delay causation is a question of fact." *JV Makyal Ins. Ve Tic. A.S. & Mehmet Erdal Kamisli Co. Ltd.*, ASBCA No. 56956, 12-1 BCA ¶ 34,913 at 171,662; *see also Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001) ("Causation is also a question of fact[.]"). "[T]he contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (*en banc*). "[A] contractor cannot recover 'where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government.'" *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1292 (Fed. Cir. 2000) (quoting *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982)). "Nevertheless, if 'there is in the proof a clear apportionment of the delay and the expense attributable to each party,' then the government will be liable for its delays." *Id.* (quoting *Coath & Goss, Inc. v. United States*, 101 Ct. Cl. 702, 714-15 (1944)).

Al Ghanim relies on its daily quality control reports, which contemporaneously documented delays Al Ghanim encountered on these projects (app. R11 br., exs. A.4, A.5). For the first several weeks of delays in January and February 2018, Al Ghanim's quality control reports only documented the time when it arrived at the Visitor Control Center for processing and the time when Al Ghanim and the security escort arrived at the JLOC-A or JLOC-B building sites (app. R11 br., ex. A.4 at 174-205, ex. A.5 at 1-28). From February 5 through October 31, 2018, however, Al Ghanim also provided an interim time – when the security escort arrived at the Visitor Control Center, which was between when Al Ghanim arrived at the Visitor Control Center and Al Ghanim and the security escorts arrived at the project sites (app. R11 br., ex. A.4 at 206-951; ex. A.5 at 29-741).

Al Ghanim seeks the costs for delay from when it arrived at the Visitor Control Center until it arrived at the project sites (app. R11 reply br. at 4). The Army Corps asserts that Al Ghanim overstates the delay and should only recover for any delay from the security escorts late arrival to the Visitor Control Center, not the additional travel time from the Visitor Control Center until the contractor and agency escorts arrived at the building sites (gov't R11 br. at 26-28; supp. R4, tab 39 – Witherington decl. ¶ 25(f)(ii); supp. R4, tabs 39e-h (red highlighted days)).

Al Ghanim counters that it should not be liable for the travel time delay (app. R11 reply br. at 2-5).  Al Ghanim asserts that the agency's June 2019 decisions and the subsequent unilateral contract modifications granting an extension of time based on excusable delays, proves the government's liability for the contractor's compensable delay claims, including the travel time to the sites (app. R11 reply br. at 3-8).  However, an agency's unilateral grant of a time extension based on an excusable delay does not create a presumption that the government caused any compensable delay.  *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 856-57 (Fed. Cir. 2004) (concluding that "mere grant by the government of a contract extension does not indicate that the government is at fault"); *Amatea/Grimberg JV v. Sec'y of Navy*, No. 2024-1006, 2025 WL 1752375 at *3 (Fed. Cir. June 25, 2025) ("We have clearly rejected a presumption that the government is at fault for delay when the contracting officer grants a time extension."); *see also Wright Bros., Bldg. Co., Eagle LLC*, ASBCA No. 62285, 23-1 BCA ¶ 38,255 at 185,777 ("Notwithstanding appellant's assertion to the contrary, an extension of time granted by the contracting officer does not equate to an administrative determination that the delay was not due to the fault or negligence of the appellant.").  We must assess the evidence *de novo* on appeal as presented by the parties and may not presume the government caused the delay.  *Sherman*, 388 F.3d at 856-57.

We agree with the government that the travel time was a concurrent delay that Al Ghanim would have encountered even if the security escorts arrived on time to the Visitor Control Center.  *Essex*, 224 F.3d at 1292.  Al Ghanim has failed to show or explain how the government was the cause of this travel time delay, which it must do under the Suspension of Work clause.  FAR 52.242-14(b); *Triax-Pac.*, 958 F.2d at 353-54.  Al Ghanim may not recover for the travel time from the Visitor Control Center to the work sites.  From January 20 through February 4, 2018, Al Ghanim's quality control reports fail to specify when the security escorts arrived at the Visitor Control Center to pick up Al Ghanim's personnel for travel to the worksite (app. R11 br., ex. A.4 at 174-205, ex. A.5 at 1-28).  Because there is no indication how late the security escorts were for those days, Al Ghanim has failed to prove its delay costs for those days.

Similarly, Al Ghanim faces another evidentiary issue regarding when security escorts were required to be on-site to trigger the start of a delay for certain days in March, April, and May 2018.  Typically, Al Ghanim identified the specific time when it would need security escorts on its security escort request forms (app. R11 br., ex. F).  However, the record does not include security escort request forms for March 10-31, 2018, April 1-2, 4-15, 23-30, 2018, May 1-3, 5-8, 12-15, 2018, for the JLOC-A crew; and March 12-31, 2018, April 1-2, 5-15, 23-30, 2018, May 1-3, 5-8, 12-15, 2018, for the JLOC-B crew (supp. R4, tab 39 – Witherington decl. ¶ 25(f)(v); tabs 39e, 39f (orange highlighted); app. R11 br., ex. F).  Al Ghanim asserts that the agency is now using the security escort request forms as a "weapon to avoid acknowledgment of the

27

delay" (app. R11 reply br. at 9). Yet, Al Ghanim bears the burden of producing evidence supporting its damages. *Wilner*, 24 F.3d at 1401. Without the security escort request forms for these days, Al Ghanim has no evidence to prove when the parties agreed that escorts would be available for these days; Al Ghanim has offered no other evidence on this point. Thus, Al Ghanim has failed to prove its delay costs for these days.

The Army Corps also asserts that Al Ghanim's delay costs should account for days when Al Ghanim's personnel arrived at the Visitor Control Center later than the agreed-to time (gov't R11 br. at 24-25; supp. R4 tab 39 – Witherington decl. ¶ 12(k)(v); tabs 39e & 39f (gray highlighted days); app. R11 br., ex. F; ex. A.4 at 668, 776-877, ex. A.5 at 135, 460, 568-669). Al Ghanim concedes that it only seeks "delays from the time it arrived at the [Visitor Control Center]" (app. R11 reply br. at 10).[7]

Finally, the Army Corps asserts that Al Ghanim should not recover for days when adverse weather conditions, including wet site conditions, impeded some work on the site or resulted in work stoppages at some point during the day (supp. R4, tab 39 – Witherington decl. ¶¶ 25(f)(iii)-(iv); supp. R4, tabs 39e-h (blue and yellow highlighted days)). As Al Ghanim counters, just because it encountered work stoppages later in the day does not mean Al Ghanim did not encounter compensable delays at the beginning of the day – February 18, 2018 (app. R11 reply br. at 8-9; app. R11 br., ex. A.4 at 232, ex. A.5 at 37). The government also asserts that wet site conditions prevented any work from completion on three days (February 27 – March 1, 2018), but the daily contractor and government reports only support that Al Ghanim was unable to do any "earthworks" due to the wet ground (app. R11 br., ex. A.4 at 250-55, ex. A.5 at 49-54; 62321 R4, tab 69 at 23-25; 62984 R4, tab 68 at 16-17). Had the government's security escorts arrived on time to the Visitor Control Center, then Al Ghanim would have arrived earlier to the site and may have accomplished more work those days (despite the work stoppages and impediments to some work due to wet conditions). Al Ghanim may recover for security escort delays on these days. By our calculation,[8] Al Ghanim incurred $1,444.11 in additional recoverable delay costs for these days.

---

[7] Notably, from September 3, 2018, through October 8, 2018, Al Ghanim requested security escorts to arrive at "0430" but Al Ghanim did not arrive until "0500," effectively mitigating delay costs for most of this period by arriving late (supp. R4, tabs 39e, 39f).

[8] On February 18, 2018, the security escorts arrived 10 minutes (.17 hours) late for both crews, which we multiply by the hourly rate ($285.91) for delay costs of $48.60 per crew and $97.20 for both crews (supp. R4, tabs 39e & 39f; app. R11 br., ex. A.2 at 3, ex. A.3 at 98). Consistent with Al Ghanim's approach, we

Based on our conclusions above, we add the total calculated by the Army Corps' cost analyst ($32,876) to the additional delay costs ($1,444.11) for a total recovery of $34,320.11.

<u>CONCLUSION</u>

For the foregoing reasons, Al Ghanim's delay claims are sustained in the amount of $34,320.11, plus CDA interest from when the Army Corps received Al Ghanim's certified claims.

Dated:  May 18, 2026

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

derived the hourly rate by taking the daily cost for the specific day and crew (including manpower and equipment costs) and dividing it by eight hours (app. R11 br., exs. A.2-A.3).  On February 27, 2018, the security escorts arrived within 30 minutes of Al Ghanim's crews arrival at the Visitor Control Center, so there is no compensable delay (supp. R4, tabs 39e, 39f).  On February 28, 2018, the security escorts arrived one hour and 20 minutes late (1.33 hours) for each crew, which we multiply by the hourly rate for the JLOC-A crew ($280.99) and hourly rate for the JLOC-B crew ($297.08) for delay costs of $373.72 for the JLOC-A crew and $395.12 for the JLOC-B crew and $768.84 total for both crews (supp. R4, tabs 39e & 39f; app. R11 br., ex. A.2 at 3, ex. A.3 at 98).  On March 1, 2018, the security escorts arrived one-hour late (1.0 hours) for each crew, which we multiply by the hourly rate for the JLOC-A crew ($280.99) and hourly rate for the JLOC-B crew ($297.08) for $578.07 total for both crews (supp. R4, tabs 39e & 39f; app. R11 br., ex. A.2 at 3, ex. A.3 at 98).

I concur

_____
J. REID PROUTY
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

_____
DAVID F. D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 62321, 62984, Appeals of
Al Ghanim Combined Group W.L.L., rendered in conformance with the Board's Charter.

Dated: May 18, 2026

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals